[Civ. No. 50834. First Dist., Div. Two. Mar. 22, 1983.]

AMERICAN CANYON FIRE PROTECTION DISTRICT et al.,
Plaintiffs and Appellants, v.
COUNTY OF NAPA et al., Defendants and Respondents.

COUNSEL

Jack B. Burstein and Smith & Burstein for Plaintiffs and Appellants.

Stephen W. Hackett, County Counsel, and Joseph C. Folkard, Deputy County Counsel, for Defendants and Respondents.

OPINION

**ROUSE, Acting P. J.**—Appellants, American Canyon Fire Protection District and its commissioners, appeal from a judgment denying them relief in a mandamus/prohibition proceeding against respondents, the County of Napa, the county's board of supervisors and board members.[1]

---

[1]Appellants also purport to appeal from "each of the adverse rulings and orders entered therein." Such intermediate orders and rulings are nonappealable but reviewable on appeal from the judgment.

The facts are undisputed. On August 28, 1979, respondent board of supervisors held a duly noticed and published public hearing as required by section 98.6, subdivision (b), of the Revenue and Taxation Code, for the purpose of determining the distribution of $544,392 in special district augmentation funds (so-called "bail-out" funds). Appellants were one of 23 special districts within Napa County eligible to receive such funds. Ten of those twenty-three districts, including the Napa County Fire Department, were governed either directly or indirectly by respondent board of supervisors. In the case of the Napa County Fire Department, this relationship to the board arises from section 25210.50 of the Government Code, which authorizes the board to furnish structural fire protection services to county service areas established for that purpose. Respondent board provides such services in the unincorporated areas of Napa County through the Napa County Fire Department and is responsible for reviewing and approving the budget of that fire department. Both petitioners and the Napa County Fire Department were represented at the public hearing and requested that funds be distributed to their respective special districts. As a result of the hearing, the board increased by $11,000 the amount of funds to be distributed to appellants.

Respondents distributed $107,583 to appellants and $302,102 to the Napa County Fire Department for the fiscal year in question, 1979-1980. Appellants' and the Napa County Fire Department's respective budget deficits for that fiscal year were $153,190 and $336,762. It appears by our calculations that approximately 63 percent of appellants' and 90 percent of the Napa County Fire Department's budget deficits were thus covered by the funding.

On November 26, 1979, appellants filed a petition for writ of mandate or prohibition in superior court, seeking to have the board's action annulled and to have the court reallocate the funds. After trial of the matter, the court denied the petition. Judgment was entered accordingly on May 15, and appellants filed a timely notice of appeal therefrom on July 10, 1980.

Two issues are presented: (1) Did the fact that respondent board served in a dual capacity as both the body charged with distributing the augmentation funds and the governing board for the Napa County Fire Department, one of the recipients of such funds, create a conflict of interest which, as a matter of law, rendered its distribution of the funds invalid? (2) If not, then, did the board distribute the funds in a procedurally unfair manner and thus fail the mandamus standard of review for quasi-legislative acts?

The trial court answered both questions in the negative, stating in its memorandum of decision, "The Napa County Board of Supervisors was not disqualified from allocating Special District Augmentation Funds to [ap-

pellants] and others by reason of a prohibited conflict of interest or the occupancy of incompatible offices. The procedure established by the Legislature in Revenue and Taxation Code section 98.6(b) and as implemented by respondents was consistent with public policy and fairly conducted in a lawful manner." For reasons expressed herein, we agree with the trial court and accordingly affirm the judgment denying the petition. Appellants do not claim that any of the individual board members were financially interested in the matter under review. (See Gov. Code, §§ 1090, 87100, 87103 and 87200, prohibiting board of supervisors members from maintaining a financial interest in actions performed in their official capacities.) Instead, we are faced with a claim of nonstatutory or "common law" conflict of interest stemming from the holding of incompatible offices or trusts by board members—in this case, by all members of the board. (See discussions in *People* ex rel. *Chapman* v. *Rapsey* (1940) 16 Cal.2d 636, 641-642 [107 P.2d 388]; *People* v. *Garrett* (1925) 72 Cal.App. 452, 455-458 [237 P. 829]; cf. *City of Imperial Beach* v. *Bailey* (1980) 103 Cal.App.3d 191, 196 [162 Cal.Rptr. 663] [involving a statute prohibiting financial interest].) Appellants argue that the financial interest cases have application to the facts of this case because the board's agency, the Napa County Fire Department, received financial benefits. We find that argument superficial and attenuated, for there is no evidence that board members even *indirectly* received any personal financial benefit by the distribution of funds to its agency. Nevertheless, we agree that the public policy considerations which underlie both the incompatible offices and financial interest strains of conflict of interest law are similar. Irrespective of the source of the conflict, the common concern is the redounding detriment to the public, although in the financial interest situation there appears to be an additional and independent concern that public officials not be allowed to personally profit from decisions made in their official capacities. In any event, there is no financial interest problem here, and we are left with the pure question of real or potential public detriment.[2]

Any harm to the public in this case flows from the possibility that board members, in their dual capacities as distributors of the augmentation funds and governing board of a special district receiving such funds, might not give the public undivided allegiance in the performance of their duties in either capacity.

---

[2]The California Attorney General makes a semantical distinction between the two varieties of conflicts for clarity of analysis, but recognizes the essential similarity of the two. "The [incompatible offices variety] involves 'conflicts' arising between two public positions or interests, where the [financial interest variety] involves 'conflict' arising between a public position and personal interests. As we stated with respect to this distinction in 55 Ops.Cal.Atty.Gen. 36, 39 (1972): [¶] 'Problems of analysis frequently arise because of interchange of the terms "incompatibility" and "conflict of interest." We consider that conflict of interest refers only to the "private-public" situation; whereas, incompatibility refers to the "public-public" situation where no *personal* conflict of interest is involved.' [¶] However, both [varieties]—whether they deal with 'incompatibility of office' or personal 'conflicts of interest'—basically involve the general subject matter of conflicts of interest." (61 Ops.Cal.Atty.Gen. 396, 399 (1978).)

That potential harm, while perhaps sufficient to make out a common law conflict of interest, does not necessarily render the board's actions invalid, i.e., a *prohibited* conflict of interest does not necessarily arise.

Although a conflict of interest may arise under the common law rule against incompatible offices, "There is nothing to prevent the Legislature . . . from allowing, and even demanding, that an officer act in a dual capacity." (*McClain* v. *County of Alameda* (1962) 209 Cal.App.2d 73, 79 [25 Cal.Rptr. 660].) Appellants rely heavily on a string of opinions by the California Attorney General[3] as support for their contention that the board's alleged conflict of interest invalidated the distribution, but fail to respond to the *McClain* case, or acknowledge that the Attorney General opinions give full recognition to *McClain*. For example, in 63 Ops.Cal.Atty.Gen. 748 (1980), it was noted, at page 750, that "The Legislature may . . . and often does abrogate the common law doctrine when it considers it necessary or convenient to permit officers to hold incompatible offices. (See *McClain* v. *County of Alameda* [*supra*, at p. 79]; 61 Ops. Cal. Atty. Gen. 396, 398 (1978).)"

In *McClain,* it was argued that the procedure as then established by the County Employees Retirement Law of 1937 for the investment of retirement funds in public improvements (Gov. Code, §§ 31601-31607) created a prohibited conflict of interest on the part of a board of supervisors because the board concurrently acted as officers of the county and as the approving body for the board of retirement in lease-purchase contracts entered into between the county and the board of retirement. The court rejected the argument, concluding, "certainly the Legislature may, as it has done, establish a carefully planned system whereby counties may have the advantage of financing public improvements by contracts which provide for the use of retirement funds; the retirement funds, on the other hand, having the advantage of prime investments, even though there is imposed upon public officers the duty of creating a contract that is fair to both parties." (209 Cal.App.2d 73, 79.)

This case is analogous. As in *McClain* v. *County of Alameda, supra,* 209 Cal.App.2d 73, the Legislature has not explicitly abrogated the common law prohibition, yet it is implicitly evident from the statutory scheme that the Legislature intended to do so. Like *McClain,* this case concerns a potential conflict of interest as to the entire board of supervisors, not just as to individual members whose conflicting offices might not have been anticipated in drafting the legislation. Finally, unlike most cases in which the conflict of interest doctrine is raised, both this and the *McClain* case concern a conflict arising from

---

[3]Appellants refer to general language on conflicts of interest in 58 Ops.Cal.Atty.Gen. 241, 244 (1975); 55 Ops.Cal.Atty.Gen. 36, 38-39 (1972); 42 Ops.Cal.Atty.Gen. 151, 155 (1963); 40 Ops.Cal.Atty.Gen. 210, 212 (1962).

different functions of the same office rather than from two different offices as such.[4] All of the above-mentioned factors lend support to our conclusion that the dual functions imposed by the Legislature on the board of supervisors were ,imposed deliberately and with knowledge that a conflict could result.

A closer look at the statutes makes our conclusion inescapable, for the scheme contemplates that the county board of supervisors is the only body authorized to perform both functions or "offices."

Section 98.6, subdivision (b), of the Revenue and Taxation Code, enacted in 1979, creates the special district augmentation fund, provides for augmentation funds to be allocated to each area's "governing body" and mandates that the governing body "shall determine the amount of funds to be disbursed to each special district." The term "governing body" is defined by reference to section 16271, subdivision (a), of the Government Code, which provides that " 'Governing body' means the board of supervisors . . ." except in the case of a subsidiary district or a multicounty district. Thus, in the case of Napa County or any other county-wide allocation area, the board of supervisors is the only body charged with distributing the funds.

Section 25210.50 of the Government Code provides, "The board of supervisors of any county is authorized to provide, pursuant to the provisions of this chapter, structural fire protection services within any county service area established for that purpose." Again, only the board of supervisors is authorized to establish and provide services to a "county service area," and a county service area is deemed a "special district" for purposes of the augmentation fund distribution scheme. (Rev. & Tax. Code, § 2215.) It is important to note in perspective that section 25210.50 is not a remote or obscure source of potential conflict of which the Legislature may not have been aware. It is part of the County Service Area Law (Stats. 1953, ch. 858, § 1, p. 2189), which, with additions and amendments over the years since its enactment, has come to be the source of many essential county services in addition to fire protection, such as extended police protection (Gov. Code, § 25210.40), local park, recreation or parkway facilities (Gov. Code, § 25210.60), extended library facilities and services (Gov. Code, § 25210.78) and television translator station facilities and services (Gov. Code, § 25210.4, subd. (f)). (See generally Gov. Code, § 25210.1 et seq.)

What emerges from the interplay of the statutes just examined is that the Legislature intended, and in fact mandated, that a county board of supervisors

---

[4]The more typical conflict arises where two incompatible public offices are held by one person. In *People* ex rel. *Chapman* v. *Rapsey, supra,* 16 Cal.2d 636, for example, the same man held the offices of city judge and city attorney.

distribute augmentation funds among all special districts, including those created and to some extent governed by the board itself. The Legislature could not have been blind to the potential conflicts of interest created statewide by imposing those dual functions. In Napa County alone, the parties inform us, 10 out of the 23 eligible special districts were governed directly or indirectly by the board.

We conclude that the Legislature has chosen to abrogate the common law conflict of interest doctrine in establishing the special district augmentation fund distribution scheme of section 98.6, subdivision (b), of the Revenue and Taxation Code, and that the public policy of this state is therefore not offended by any conflicts of interest arising thereunder by reason of the dual functions exercised by the board of supervisors. Accordingly, we hold that the board's distribution of the augmentation funds was not invalid on common law conflict of interest grounds.

By our holding we do not mean to suggest that the mere fact of statutory authorization of two board of supervisors functions should always be read as indicating a legislative will to abrogate the common law doctrine, especially where, as here, that authority emanates from different codes and from statutes enacted at different times. But the circumstances detailed above compel that conclusion in this case.

Appellants' second contention is that the board's action in distributing the augmentation funds, even if not invalid as a matter of law on the basis of conflict of interest, will not withstand mandamus review. For purposes of this contention, the parties appear to accept the proposition that the board's function in distributing the funds was quasi-legislative, as opposed to judicial or quasi-judicial. (Cf. *Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App. 2d 271, 278-281 [63 Cal.Rptr. 889], holding that a water district board of directors exercised quasi-legislative powers in passing on petitions to exclude and annex lands to the district, even though its actions were as to specific parties and petitions, because the petitions posed "fundamentally political questions . . . ." (P. 281.))

Our inquiry upon mandamus review of a quasi-legislative act is limited to whether a decision is arbitrary, capricious, entirely lacking in evidentiary support, contrary to established public policy, or unlawful or procedurally unfair. (*Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 386-387 [146 Cal.Rptr. 892]; *Patterson* v. *Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 840 [130 Cal.Rptr. 169]; see also *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].) Of those grounds, appellants raise only the

claim of procedural unfairness, and that claim is based solely on the alleged conflict of interest just discussed. Appellants rely on the *Lewin* case, *supra,* in which the court concluded that judicial interference by way of mandamus is authorized "where administrative action [is] shown to be . . . indisputably contrary to established public policy." (82 Cal.App.3d at p. 386.) For reasons expressed above, however, we have concluded that the distribution scheme was not contrary to established public policy, and the *Lewin* case therefore does not help appellants. We hold that there was no procedural unfairness in that respect.[5]

The purported appeal from "each of the adverse rulings and orders entered therein" is dismissed. The judgment denying the petition is affirmed.

Miller, J., and Smith, J., concurred.

---

[5]Appellants do not claim any irregularity in the proceedings save the conflict of interest.