[Civ. No. 28765. Fourth Dist., Div. One. June 14, 1984.]

J. W. JONES COMPANIES et al., Plaintiffs and Respondents, v.
CITY OF SAN DIEGO et al., Defendants and Appellants.

## COUNSEL

John W. Witt, City Attorney, Janis Sammartino Gardner, Deputy City Attorney, Stradling, Yocca, Carlson & Rauth, Richard C. Goodman, Thomas P. Clark, Jr., Barney A. Allison, Freilich & Leitner, Frelich, Leitner & Carlisle, Robert H. Freilich, Martin L. Leitner, Neil R. Shortledge and Wayne M. Senville for Defendants and Appellants.

Robert J. Logan, City Attorney (San Jose), Allen Grimes, City Attorney (Atascadero), Robert W. Parkin, City Attorney (Long Beach), Ira Reiner, City Attorney (Los Angeles), William C. Marsh, City Attorney (Monterey), William J. Adams, City Attorney (Palm Springs), Victor J. Kaleta, City Attorney (Pasadena), George Agnost, City Attorney (San Francisco), Steven A. Amerikaner, City Attorney (Santa Barbara), and Gerald A. Sperry, City Attorney (Stockton), as Amici Curiae on behalf of Defendants and Appellants.

Gray, Cary, Ames & Frye, Lance C. Schaeffer, Brian L. Forbes and Michael M. Hogan for Plaintiffs and Respondents.

## OPINION

**BUTLER, J.**—The City of San Diego, members of the city council and the city auditor and city treasurer, appeal a judgment granting J. W. Jones Companies' and Housing Partners Limited's request for a peremptory writ of mandate requiring San Diego to set aside a resolution imposing a facilities benefit assessment (FBA) on undeveloped property in North University City, and enjoining San Diego from adopting any FBA resolutions imposing like assessments on any other property in the city.

J. W. Jones Companies and Housing Partners, Limited are developers and landowners of North University City property which was assessed under the resolution. In April 1982, Jones asked the court for a peremptory writ of mandate requiring San Diego to set aside the FBA resolution and, alternatively, asked the court for declaratory and injunctive relief. Jones alleged the FBA was a special tax violating California Constitution article XIII A,

section 4 (Prop. 13);[1] was an invalid special assessment because not based on special benefits to the properties assessed; and violated Jones' constitutional right to equal protection by excluding developed properties (which Jones alleged were benefited by the improvements as much as the undeveloped properties) from the "area of benefit."

The court issued the writ and enjoined San Diego from adopting any other FBA resolutions. The court found:

(1) The FBA was a new financing device developed by San Diego to pay for public improvements which in the past had been financed out of San Diego's general funds.

(2) The FBA was not a valid special assessment because the improvements financed did not specially benefit the North University City properties assessed.

(3) The FBA improperly apportioned assessments because (a) the apportionment was based on the properties' need for the improvements rather than the benefits conferred by the improvements to the properties and (b) in apportioning the assessment the FBA formula did not include a variable accounting for each particular parcel's proximity to each improvement financed. The court determined the FBA was not a valid special assessment and was a special tax which violated Proposition 13.

We conclude the FBA is a valid exercise of the city's power to impose charges upon property within a designated area to pay for public facilities serving the needs of those who will reside in that area. Such charges are not special taxes requiring voter approval under Proposition 13. We reverse the judgment and direct the court to vacate the injunction enjoining further exercise of the FBA ordinance and to deny the petition for writ of mandate.

I

In the mid 1960's, San Diego adopted and has since refined and amended its progress guide and general plan. The general plan with broad brush sets out policies to deal with population growth, industrial development and environmental concerns. The general plan classifies community planning areas as urbanized, planned urbanizing and future urbanizing. Planned ur-

---

[1]California Constitution, article XIII A, section 4, reads: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

banizing areas include developing communities and new communities. These areas are projected to contain 178,360 dwelling units, housing some 472,500 people by the year 2000. As of 1980, 46,760 units housing 132,420 people had been constructed. The general plan requires the development of land in the planned urbanizing areas to be consistent with specific community plans and developers are required to bear the prime responsibility for providing community facilities. This appeal concerns North University City, a planned urbanizing area, its projected development to include 23,130 single and multifamily residences and 698 acres of commercial and industrial facilities and San Diego's requirement owners of land bear part of the cost of public facilities necessary to serve anticipated population.

II

On August 25, 1980, San Diego enacted ordinance No. 0-15318, adding sections 61.2200 through 61.2216 to the Municipal Code, relating to the designation of areas of benefit to be assessed the cost of public facilities (the ordinance). The ordinance established procedures to implement the general plan policies requiring public facilities in planned urbanizing areas such as North University City be financed by "special assessment proceedings, consideration from developers, the City's General Fund or some combination thereof." The ordinance provides for initiation of proceedings for the designation of an area of benefit defined as lands receiving special benefits from the construction of public facilities projects which are any public improvement "the need for which is directly or indirectly generated by development." Public improvements embrace a broad spectrum of works including water mains, utilities, sewers, drainage systems, streets and sidewalks, parks, transit and transportation, libraries, fire stations, school buildings and police stations. The list is not exclusive.

Upon initiating the proceedings, the city council receives a report containing a financing plan, a description of the project, an estimate of the total cost, a schedule for timing of construction, the designation of the area of benefit and a proposed apportionment of cost among the parcels within the area of benefit in proportion to the estimated benefits received by the parcels and an estimate of the amount of facilities benefit assessments (FBA) charged to each parcel. A resolution of intention is adopted, protests are filed, a hearing is held, and the proceedings are abandoned if a majority protest is not overruled by an affirmative vote of four-fifths of the members of the city council. Absent such protest and vote, a resolution designating the area of benefit and the establishment of the FBA against each parcel in the area is adopted. A map of the area of benefit is filed with the city clerk showing the levy of the FBA as to each parcel and a resultant lien on the

parcel in the amount of the FBA. A notice of assessment is then recorded with the county recorder showing the FBA lien as to each parcel.

Building permits may not be issued for development of any FBA land within the area of benefit until the FBA on such land has been paid. The FBA must be paid when the capital improvement program for the area calls for commencement of the public facilities project. FBA payments are deposited in a special fund established for the area of benefit and are used solely for the purposes for which the FBA was levied. Upon payment, the lien is discharged. For failing to pay, the city may foreclose the lien. Annual adjustments of the FBA may be made by the city reflecting increases or decreases in cost or scope of the facilities or availability of other funds for construction. The area of benefit may be terminated and the liens discharged by the city on a finding the public facilities project will not be required or other financing is more effective.

## III

On December 15, 1980, the city adopted a resolution of intention initiating the designation of North University City as an area of benefit. The required report was prepared showing $54,776,747 as the cost of the public facilities payable $25,763,289 by developers as subdivision charges, $26,852,923 through the FBA, $1,802,937 from the city and the balance from other sources. Street improvements accounted for $45,712,283 and parks and recreation for $9,064,464 for the total of $54,776,747. The streets and parks are the only public facilities to be constructed to serve the development of North University City and less than one-half their costs are chargeable to parcels impressed with the FBA lien.

A public hearing was held, protests were received and denied and the report was adopted. The public facilities project was ordered to be undertaken and $26,852,923 attributable to the FBA was apportioned among the parcels within the area of benefit, the amount being fixed as a lien as to each parcel.

## IV

In this factual setting, we review the court's determination the FBA is a special tax requiring voter approval under section 4 of Proposition 13. Proposition 13 is not a stranger in our courts. *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281], put down the welcome mat of constitutionality, predicted a case by case approach to anticipated judicial challenges and held article XIII A formed "an interlocking 'package' deemed necessary by the

initiative's framers to assure effective real property tax relief." (*Id.*, at p. 231.) *Solvang Mun. Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App.3d 545 [169 Cal.Rptr. 391], considered the impact of the one percent limitation on real property ad valorem taxes established by Proposition 13 on nonvoted special assessments predating its effective date.[2] *Solvang* noted: "In practical application, the two types of taxation, general ad valorem taxes and special assessments, to some extent overlap, and we cannot always differentiate between them with precision." (*Id.*, at p. 553.)

*Solvang* defined an ad valorem tax on real property as a general tax levy which applies a given rate to the assessed valuation of all taxable property within a particular taxing district, pays for general expenditures and for general improvements deemed to benefit all property owners within the taxing district whether or not they enjoy any direct benefit from the expenditure or improvement. "In contrast, a special assessment, sometimes described as a local assessment, is a charge imposed on particular real property for a local public improvement of direct benefit to that property, as for example a street improvement, lighting improvement, irrigation improvement, sewer connection, drainage improvement, or flood control improvement. The rationale of special assessment is that the assessed property has received a special benefit over and above that received by the general public. The general public should not be required to pay for special benefits for the few, and the few specially benefited should not be subsidized by the general public. . . . Although a special assessment is imposed through the same mechanism used to finance the cost of local government, in reality it is a compulsory charge to recoup the cost of a public improvement made for the special benefit of particular property. It has been said that, strictly speaking, a special assessment is not a tax at all, but a benefit to specific real property financed through use of public credit.

" . . . . . . . . . . . . . . . . . . . . . . .

"In sum, a special assessment is a charge levied against real property particularly and directly benefited by a local improvement in order to pay

---

[2]"The more difficult question is whether a nonvoted special assessment for a local improvement which directly benefits specific real property comes within the 1 percent limitation on real property ad valorem taxes established in article XIII A. The difficulty arises from an incongruity in the article's section 1, whose two subdivisions read: '(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of *the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.*

"'(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective.'

"The incongruence in the section results from the reference in subdivision (a) to *ad valorem tax*[es] and the reference in subdivision (b) to *ad valorem taxes or special assessments.*" (*Solvang, supra,* at p. 550, original italics.)

the cost of that improvement." (*Solvang, supra,* at pp. 552, 553, 554.) *Solvang* held governmental entities can finance public improvements to benefit specified real property by special assessments on the benefited property without regard to the one percent limitation on ad valorem real property taxes specified in section 1 of Proposition 13.

*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935], addressed the meaning of the term "special taxes" as used in section 4. San Francisco increased a tax imposed on business to 1.5 percent of payrolls or gross receipts. The proceeds of the tax were to be used for general revenue purposes. The electorate approved by a majority vote an extension of the ordinance imposing the increase. The city controller refused to disburse any funds collected on the increased rate, contending the new rate was a special tax requiring a two-thirds vote. The tax was a tax on gross receipts or payrolls and not a property tax, special or ad valorem, or an assessment levied on real property. The sole issue was the kind of tax in the circumstances presented: "In our recent decision in *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197 . . . , we interpreted the effect of this provision as it applies to 'special districts,' holding that as used in section 4 that term encompasses only entities empowered to levy a property tax. The present action involves the meaning of another term used in section 4: the issue is whether a payroll and gross receipts tax, the proceeds of which are placed into a city's general fund to be used for general governmental expenditures, constitutes a 'special tax' so that a two-thirds vote of the electors is required in order to adopt such a tax." (*Id.,* at p. 50.)

The court noted the term "special taxes" is ambiguous, meaning different things in different contexts. "One meaning frequently attributed to it by cases and statutes is a tax 'collected and earmarked for a special purpose, rather than being deposited in a general fund.'" (*Id.,* at p. 53.) Finding little guidance in the Proposition 13 ballot pamphlet, the court searched in vain for guidance in legislation adopted after the enactment of Proposition 13: "The parties refer to sections 50075 through 50077 of the Government Code, enacted in 1979, as an indication of the Legislature's interpretation of section 4. These provisions authorize the imposition of special taxes by local entities upon the concurrence of two-thirds of the electorate voting on the measure. Section 50076 states that, as used in the article ' "special tax" shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes.' Farrell contends that this provision implies that the Legislature viewed an exaction for general revenue purposes to be a 'special tax' within the meaning of section 4. However, section 50076 refers to a fee for services and we are not here concerned

with whether such a fee may exceed the cost of the service provided, but with whether section 4 permits the levy of a tax for general revenue purposes without a two-thirds vote. The exception provided by section 50076 sheds little light on this question." (*Id.*, at pp. 55-56.) The court construed the term special taxes in section 4 to mean "taxes which are levied for a specific purpose rather than . . . a levy placed in the general fund to be utilized for general governmental purposes." (*Id.*, at p. 57.) "This is a common meaning of the term, as is evident from the authorities cited above. More important, such a construction will provide the voters with the 'effective' property tax relief we discussed in *Amador* to the extent the section clearly requires a two-thirds vote for the adoption of a 'special tax,' while ascribing some meaning to every word used in the section." (*Id.*, at p. 57.)

We continue our review of cases wrestling with Proposition 13's impact on financing local government operations and construction of public improvements.

*Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317 [170 Cal.Rptr. 685], returns us to charges imposed on real property to finance public improvements. There, Oxnard enacted an ordinance in compliance with Government Code section 65970 providing for dedication of land or payment of fees by developers for interim facilities for schools. The ordinance required payment of a facilities fee based on the number of students generated by a proposed residential development or an in lieu dedication of land equivalent in market value to the fee otherwise payable. A subdivider challenged the constitutionality of the ordinance contending the fee was a special tax within the meaning of section 4 of Proposition 13 as being collected and earmarked for a special purpose, was a new revenue exaction and was not a special assessment. The court declined to define special taxes as used in section 4 (*id.*, at p. 328), concluded exaction of fees was not an ad valorem tax and held the imposition of the fees was a proper exercise of the police power under *Associated Home Builders Etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847], and *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225 [118 Cal.Rptr. 158, 529 P.2d 582].

*County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974 [156 Cal.Rptr. 77], held special assessments made under the provisions of the Improvement Act of 1911 and the Municipal Improvement Act of 1913 were not "special taxes" within section 4 of Proposition 13. "Respondent is correct in pointing out that the power to create special assessments to pay the costs of improvements to specific parcels of property is a 'peculiarly legislative process grounded in the taxing power of the sovereign.' [Citation.] This origin of the special assessment is perhaps one of the reasons the terms 'tax,'

'special tax' and 'special assessment' have become at times hopelessly entangled in judicial opinions, legislation and legal treatises." (*Id.*, at p. 983.) The court pointed out taxes are raised for the general revenue to pay for a variety of public services. A special tax is one collected and earmarked for a special purpose and is not deposited in the general fund. However: "A special assessment is charged to real property to pay for benefits that property has received from a local improvement and, strictly speaking, is not a tax at all." (*Id.*, at pp. 983-984.) The court concluded the special assessment procedures of the Improvement Act of 1911 do not impose a special tax "since the special assessment has no impact upon general governmental spending—the overriding concern of article XIII A—a very broad and liberal construction of the term 'special taxes' to include such special assessments is not required to fulfill the purposes of this constitutional provision." (*Id.*, at p. 985.)

*City Council* v. *South* (1983) 146 Cal.App.3d 320 [194 Cal.Rptr. 110], considered an ordinance of San Jose patterned after the Improvement Act of 1911 assessing real property for the costs of maintaining and operating landscaping on highway medians. The ordinance was attacked as levying a special tax subject to section 4 of Proposition 13 requiring voter approval. The court held the special assessment for maintenance purposes was not a "special tax" within the meaning of section 4: " 'Special tax' as used in that section does not mean special assessment, but taxes levied for a specific purpose. [Citation.]

"Further, section 4 by its terms is restricted to taxes that can be 'imposed' by the electoral process. Due process requirements [citations], notice and the opportunity to be heard, which apply to special assessment, are not necessary for the imposition of a tax. [Citations.] In *Brookes* [v. *City of Oakland* (1911) 160 Cal. 423 (117 P. 433)] (at p. 431) our Supreme Court held unconstitutional a statute that provided for the levy of an assessment by a vote of the qualified electors, as 'the *constitutional requirement of due process of law is not fulfilled, unless there is provided a notice and an opportunity to be heard* to the property-owner, *upon the question whether or not his property is in fact benefited* by the improvement, *and whether or not it shall be, in effect, excluded from the district, although within its territorial limits.*' [Italics added by *City Council* v. *South.*] Thus the elective processes do not apply to benefit assessments. [Citations.] To construe section 4 to include special assessments would render it unconstitutional. We conclude that section 4 does not apply to the instant special assessment." (*Id.*, at p. 332.)

V

■ Against this backdrop of fact and case law, we now analyze the ordinance. Procedurally, the ordinance traces its ancestry to state laws pro-

viding for the financing of public facilities through assessment of costs apportioned amongst properties specially benefited by the facilities. (The Improvement Act of 1911 (Sts. & Hy. Code, §§ 5000-6794); the Street Improvement Act of 1913 (Sts. & Hy. Code, §§ 7000-7476, repealed Stats. 1963, ch. 346, § 1, p. 1136); the Municipal Improvement Act of 1913 (Sts. & Hy. Code, §§ 10000-10609); the Improvement Bond Act of 1915 (Sts. & Hy. Code, §§ 8500-8851).) For over 60 years these laws have provided the most widely used procedure in California for the construction of public improvements payable by property owners benefited by them in cash or in instalments. (*County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d at p. 978.)

Substantively, the ordinance and the FBA are but distant cousins to those familiar public work financing arrangements which contemplate the fixing of times for the commencement and completion of the work, the award of contracts for the work, the spread of the cost of work to property specially benefited by it and the assessment of the benefited parcels to pay the cost of the work through the issuance of bonds constituting a lien on the benefited parcel.

The ordinance is not clothed in this traditional attire. Here, the FBA imposed pursuant to the ordinance impresses a lien on enclaves of undeveloped property within an area of benefit to pay in the future for public facilities to be installed in the future at a cost measured in 1980 dollars subject to future annual adjustment upwards or downwards depending on economic conditions. While traditional assessments are spread on a front or square footage or ad valorem basis, the FBA is apportioned amongst the parcels according to the number of "net equivalent dwelling units" attributable to each parcel at its highest potential development under current zoning. The formula is based on an assumed level of need for the proposed facilities generated by development of the assessed parcels. The formula does not consider the location of an assessed parcel vis-á-vis any particular improvement.

San Diego's general plan is the instrument through which the city seeks to manage an explosive growth with land use controls, development of new and urbanizing communities over a period of years and the financing of public facilities through assessment of benefited property. We recognize the ordinance for what it is—imposing a present lien on undeveloped property to pay in the future an apportioned share of the costs of public facilities required to accommodate the needs of future residents of the properties upon their development. We also recognize the ordinance does not mirror general state law and address the contention its failure so to do constitutes the FBA a special tax and not a special assessment.

## A.

San Diego enacted the ordinance under article I, section 2 of its charter and the home rule power conferred by article XI, section 5 of the California Constitution. ■ San Diego has the power to finance public improvements through assessment procedures enacted by ordinance without regard to the provisions of state law. (*City Council* v. *South, supra,* 146 Cal.App.3d at p. 326.)

## B.

■ Jones contends the public facilities financed by the FBA do not confer a special benefit on the assessed parcels because some of the facilities are remote and any benefit must therefore be indirect. Special benefits are identifiable by factors enumerated in the cases. The FBA assessments do not exceed the cost of the improvements attributable thereto (*City Council* v. *South, supra,* 146 Cal.App.3d at p. 335), the assessment is not made on an ad valorem basis (*County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d at pp. 980-981), the assessment cannot result in personal liability (*County of Placer* v. *Corin* (1980) 113 Cal.App.3d 443, 450, fn. 4 [170 Cal.Rptr. 232]). The city in the spread of the FBA assessments considered the amount apportioned to each parcel in the area of benefit in contemplation of the proposed public facilities. As we noted in our factual presentation, the report adopted by the city council includes a comprehensive analysis of North University City, its component parts developed and undeveloped and the public facilities required to serve them and their anticipated population. On the record we cannot say contiguity is essential to the conferring of a benefit as the city considered proximity of parcels to the public facilities in the levy of the assessment. Absence of benefit is not established by Jones and the city's determination of benefit is conclusive. (*White* v. *County of San Diego* (1980) 26 Cal.3d 897, 904 [163 Cal.Rptr. 640, 608 P.2d 728]; *Dawson* v. *Town of Los Altos Hills* (1976) 16 Cal.3d 676, 684 [129 Cal.Rptr. 97, 547 P.2d 1377]; *Associated Home Builders etc., Inc.* v. *City of Walnut Creek, supra,* 4 Cal.3d 633.)

## C.

Jones argues the FBA does not fit the pigeonhole of a special assessment as developed properties within the area of benefit are excluded from the levy which liens only undeveloped properties, with the result special benefits go to unliened parcels negating the requirement property within the area of benefit must bear the cost of the special benefits so conferred. ■ The issue presented is whether the ordinance as implemented by the FBA is a denial of the equal protection of the law.

Developed property within the area of benefit is presently served with public facilities presumably adequate for the people residing or working in the area. The owners of the developed property did not initiate the FBA proceedings. The sequence of development for planned urbanized areas mandated by the general plan clearly contemplates provisions for housing and industry to accommodate projected population increases in North University City. Undeveloped property necessarily will provide the site for residential and industrial development. Consistent with general plan policies, undeveloped property is required to bear the burden of paying for public facilities the need for which is generated by their development. All undeveloped properties are included within the FBA. While the already developed parcels may derive incidental benefit from the new facilities, we perceive no discriminatory classification between developed and undeveloped properties. (*Associated Home Builders etc., Inc.* v. *City of Walnut Creek, supra,* 4 Cal.3d at pp. 639-640.) The levy on undeveloped properties only has a reasonable basis. The incidental fallout of benefit to developed parcels does not result in such inequality as to offend equal protection concepts. (*Wood* v. *Public Utilities Commission* (1971) 4 Cal.3d 288, 294-296 [481 P.2d 823]; *Norsco Enterprises* v. *City of Fremont* (1976) 54 Cal.App.3d 488, 498 [126 Cal.Rptr. 659].)

### D.

The North University City FBA encompasses some 25 separate improvements to be constructed between 1981 and 1991. Each of these elements of the public facilities are integral to the planned development of the area of benefit. The court held each such improvement conferred a benefit which required it to be separately measured. In effect, the court declined to permit the city to aggregate all of the projected public facilities in the whole area of benefit in the belief each of the 25 projects were to be viewed in isolation one from the other.

The city concluded a piecemeal approach to dealing with large development projects in planned urbanizing areas would inevitably lead to a haphazard, random growth putting heavy burdens on those seeking early development of their land and lighter loads upon those coming into development at later times. Importantly, that approach would necessarily defeat general plan policies for planned development as spelled out in the North University City community plan. The aggregation of all the improvements in the FBA and the spread of their costs to the undeveloped parcels in the area of benefit was proper.

### E.

In sum, the ordinance is the key to implementing San Diego's controlled growth concept as formalized by the general plan and community plan. The

narrow strictures of general law concepts of financing public facilities as embedded in acts such as the Improvement Act of 1911 or the Municipal Improvement Act of 1913 do not accommodate the dynamics of explosive growth in sunbelt cities. The undeveloped perimeters of urban centers require to be controlled in their growth not on a street by street basis looking to adjacent properties to bear improvement costs, but from the perspective of future communities planned to be complete in themselves. The vision of San Diego's future as sketched in the general plan is attainable only through the comprehensive financing scheme contemplated by the FBA. We view the precedents of yesterday's case law, not as barriers to growth, but as the guidelines to accomplish the needs of tomorrow. ▪ We hold the ordinance as applied here is a valid exercise of San Diego's power to require undeveloped land to bear the costs of the public facilities necessary for the health and welfare of the future residents of North University City.

## VI

Summarizing our conclusions, the FBA is not a tax, special or otherwise, and is not subject to section 4 of Proposition 13 requiring voter approval. (*City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d at p. 50; *County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d at p. 983; *City Council* v. *South, supra,* 146 Cal.App.3d 320, 332.) The FBA levies a special assessment on property benefited by the public facilities to pay their costs. The special assessment is a compulsory charge to recoup those costs levied under the police power. (*Trent Meredith, Inc.* v. *City of Oxnard, supra,* 114 Cal.App.3d 317; *Solvang Mun. Improvement Dist.* v. *Board of Supervisors, supra,* 112 Cal.App.3d at p. 553.) The spread of the assessment based upon the use of undeveloped property as presently contemplated by the community plan and resultant zoning is reasonable and implements the policies of the general plan. Exemption of developed property from the lien of an assessment does not deny the equal protection of the law as to undeveloped property bearing the assessment. The ordinance is a valid exercise of the police power of San Diego, a charter city.

The judgment is reversed and the court is directed to vacate the injunction enjoining further exercise of the FBA ordinance and to deny the petition for writ of mandate.

Brown (Gerald), P. J., and Cologne, J., concurred.

A petition for a rehearing was denied July 2, 1984, and respondents' petition for a hearing by the Supreme Court was denied August 23, 1984. Lucas, J., was of the opinion that the petition should be granted.