TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 86-206 |
| of | : | APRIL 15, 1987 |
| JOHN K. VAN DE KAMP<br>Attorney General | : | |
| RODNEY O. LILYQUIST<br>Deputy Attorney General | : | |

_____

THE HONORABLE L. B. ELAM, COUNTY COUNSEL, COUNTY OF SACRAMENTO, has requested an opinion on the following question:

To what extent, if any, are special districts required to contribute to the Special District Augmentation Fund where two adjoining districts received state assistance payments for the 1978-1979 fiscal year and (1) in 1980 one of the districts dissolved after its territory was annexed by the other, (2) in 1983 both districts dissolved after being consolidated into a new district, (3) in 1985 both districts dissolved after being consolidated into a new district, which included territory not previously receiving any district services, and (4) in 1983 portions of their territories were detached to form a new district?

CONCLUSION

Special districts are required to contribute to the Special District Augmentation Fund to the extent that their territories received state assistance payments for the 1978-1979 fiscal year.

1

ANALYSIS

Special districts in California are authorized under a variety of statutory schemes to provide such services as police and fire protection, water, sewage disposal, road maintenance, street lighting, trash collection, ambulance services and mosquito abatement. They may own and operate bus systems, parks, flood control projects, cemeteries, airports, libraries, swimming pools and golf courses. (See e.g., Gov. Code, § 61600; Health & Saf. Code, § 4113; Pub. Resources Code, § 5782.2; Wat. Code, § 35401.)

Traditionally a district has relied upon its authority to levy a property tax in order to fund its operations. With the addition of article XIII A to the Constitution in 1978, this source of funding was substantially curtailed. Not only did the constitutional provision reduce and limit property tax rates in general, it specified that property taxes were "to be collected by the counties and apportioned according to law to districts within the counties." (Cal. Const., art. XIII A, subd. (a); see *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 218.) No longer would the districts have the same degree of control over what would now be a reduced source of revenue.

To replace the lost property tax revenues, the Legislature has encouraged the districts to seek other sources of financing. (*Marin Hospital Dist.* v. *Rothman* (1983) 139 Cal.App.3d 495, 499-500; see, e.g., Gov. Code, § 16270.) Special districts, as well as cities and counties, now commonly impose special assessments, special taxes, user charges and compensatory fees to offset their reductions in property tax revenues. (See generally *San Marcos Water Dist.* v. *San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 160-165; *J.W. Jones Companies* v. *City of San Diego* (1984) 157 Cal.App.3d 745, 752-757; *Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 660-662.)

As for the allocation of property tax funds to special districts, the Legislature has enacted a detailed statutory scheme in complying with its constitutional mandate. The question presented for analysis concerns the degree of control the Legislature has provided county boards of supervisors in allocating property tax revenues to special districts each year.[1] Specifically, we are asked whether changes in the organizations of districts affect the ability of a board of supervisors to control the property tax allocation procedure. We conclude that the Legislature's program for

---

[1] City councils and the governing bodies of multicounty districts control the allocations with respect to districts under their jurisdictions. (Gov. Code, § 16271.) We will refer throughout this opinion, however, only to a county board of supervisors, since it would be the designated body controlling the funds of the particular districts in question.

2

flexibility and supervisorial control over property tax revenues allocated to special districts is not affected by the district changes in question.

The basic mechanism for allocating property taxes to special districts is for the taxes to be collected by the county (Rev. & Tax. Code, § 93),[2] the districts are apportioned an amount based upon a statutory formula (§§ 97, 98), and part of each district's share is transmitted to the board of supervisors for redistribution to the districts in a manner deemed appropriate by the board (§ 98.6). (See *American Canyon Fire Protection Dist.* v. *County of Napa* (1983) 141 Cal.App.3d 100, 105-106.)

In making its redistribution, the board of supervisors must first inform the districts of the total amount to be reallocated and "hold a public hearing for the purpose of determining the distribution of funds." (§ 98.6, subd. (c).) The Legislature has given the supervisors certain matters to consider (§ 98.6, subd. (e), (f), (g), (i), (j)), but essentially they may exercise their own judgment and discretion in allocating the tax revenues to the various districts. (*American Canyon Fire Protection Dist.* v. *County of Napa*, *supra*, 141 Cal.App.3d 100, 106.)

The board's control over the allocation process is dependent upon the amount of funds transferred to it by the districts. The key provisions of section 98.6 are:

"(a) Notwithstanding any other provision of this chapter, the amount allocated pursuant to Sections 96 or 97, and 98, to a special district shall be reduced by an amount computed as follows:

"(1) A ratio shall be computed for each of the special districts equal to the amount of state assistance payment for the special district for the 1978-79 fiscal year divided by the sum of the state assistance payment for the special district plus the amount of property tax revenue allocated to the special district for the 1978-79 fiscal year pursuant to Section 26912 of the Government Code.

"(2) The amount by which the allocation pursuant to Sections 75.70, 96 or 97, and 98, shall be reduced shall be equal to the allocation multiplied by the factor computed for the district pursuant to paragraph (1).

"(3) For the 1984-85 fiscal year and each fiscal year thereafter, the amount computed for each special district pursuant to this subdivision other than a special district governed by a county board of supervisors or whose

---

[2] All references hereafter to the Revenue and Taxation Code are by section number only.

governing board is the same as the county board of supervisors, shall not be greater than the amount computed for the 1983-84 fiscal year.

"(4)  The total of all amounts computed for special districts within each county shall be deposited in the Special District Augmentation Fund which shall specify amounts for each governing body as defined in Section 16271 of the Government Code and which shall be allocated pursuant to subdivision (b).

"(b)  There is hereby created a Special District Augmentation Fund in each county to augment the revenues of special districts. . . .

". . . . . . . . . . . . . . . . . . . . . .

"(d) . . . . The governing body shall disburse the entire amount of the fund to special districts during the fiscal year . . . ."

State assistance payments were made to special districts for the 1978-1979 fiscal year in the total amount of $198 million.  (Gov. Code, §§ 16270-16272; Stats. 1979, ch. 12, § 1; Stats. 1978, ch. 332, § 36.)  Property tax revenues were allocated to each special district for the 1978-1979 fiscal year under the provisions of Government Code section 26912 on essentially a pro rata basis with respect to what had been received by the district prior to the addition of article XIII A to the Constitution.

For example, a district received $60,000 in state assistance payments and $40,000 in property tax revenues for 1978-1979.  In 1987 its allocation of property tax revenues under sections 97 and 98 is $80,000.[3]  The $80,000 is multiplied by the ratio of 60 percent, resulting in $48,000 being deposited in the Special District Augmentation Fund ("Fund").  The $32,000 remainder is retained by the district.  The board of supervisors reallocates the $48,000 as it deems appropriate.  The district may receive $20,000, $48,000, $60,000, or some other figure from the supervisors.

It is evident that the Legislature intended for the Fund to provide flexibility and a measure of local control in the property tax allocation process.  Application of a

---

[3] Article XIII A of the Constitution allows for a 2 percent inflationary rate in assessing property values each year.  It also provides, however, for new assessments when property is "purchased, newly constructed, or a change in ownership has occurred."  (Cal. Const., art. XIII A, § 2, subd. (a).)  It would not be unusual for a district's total property tax revenues to have doubled over the past nine years.

4

mechanical formula set by statute cannot address individual district needs.  A board of supervisors is able to consider, evaluate, and give priority to these needs.

With this background in mind, we turn to the four reorganization changes presented in the question.  In the first situation district A and district B received state assistance for the 1978-1979 fiscal year; in 1980 district A annexed the territory of district B and district B was then dissolved.  What contribution, if any, must district A now make to the Fund?

It should be noted preliminarily that the tax revenues previously given to the dissolved district B have been transferred to district A under the provisions of section 99.  Subdivision (a) of section 99 states in part:

"For the purposes of the computations required by this chapter:

"(1)  In the case of a jurisdictional change, the auditor shall adjust the allocation of property tax revenue determined pursuant to Section 96 or 97, or the annual tax increment determined pursuant to Section 98, for local agencies whose service area or service responsibility would be altered by such jurisdictional change. . . ."

For example, district A received $100,000 in state assistance for 1978-1979, while district B received $30,000. Tax revenues for that year were allocated to district A in the amount of $50,000 and to district B in the amount of $10,000.  The $10,000 in revenues plus the taxes based upon yearly increases in property values ( 98) would now be allocated to district A under the terms of section 99.

Returning to the provisions of section 98.6, we believe that district A in our example must now contribute an amount equal to two-thirds of its current tax allocation resulting from assessments in the area originally served by it and three-fourths of its current tax allocation resulting from assessments in the area previously served by district B.[4]  Even though district B has dissolved, district A should be considered as succeeding to the former's contribution obligation inasmuch as it succeeds to the tax revenues of the former district under section 99.

Clearly district A is not precisely the same district as it existed and received state assistance payments in 1978-1979.  Its territory has increased and other changes may have occurred as a result thereof. District B has in fact dissolved since receiving the

---

[4] Section 98.6, subdivision (a), subsection (3) limits the Fund contributions of a separately elected district board to its 1983-1984 contribution level.

5

state assistance payments. A conclusion that an organizational change subsequent to 1978-1979 eliminates a district's Fund contribution would invite districts to reorganize without legitimate reason. No further contributions would be made but the consequence would be that the Legislature's program for flexibility and a measure of local control over the allocation process would be eliminated. A mechanical application of the statutory formula without consideration of the special needs and requirements of the districts would instead take place. Such a result would thwart the evident purpose of section 98.6. We find no indication of legislative intent that the formula in section 98.6 should be construed so as to substantially reduce or increase the assets of the Fund merely because of a change of district organization.

In interpreting statutes, we are directed to "ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645; accord *People* v. *Craft* (1986) 41 Cal.3d 554, 559.) "Interpretive constructions which . . . defy common sense, or lead to mischief or absurdity, are to be avoided." (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844; see *Fields* v. *Eu* (1976) 18 Cal.3d 322, 328; *Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 98.) Whenever possible, we should "interpret statutes so as to make them workable and reasonable." (*City of Santa Clara* v. *Von Raesfeld* (1970) 3 Cal.3d 239, 248.) We believe that our conclusion with respect to the first situation is consistent with these principles of law.

In the second situation presented by the question, district A and district B received state assistance payments for the 1978-1979 fiscal year, in 1983 the two districts were consolidated into district C, and districts A and B were dissolved. Does district C now have an obligation to contribute to the Fund?

The same principles applied to the first situation appear applicable here. District C has been allocated the tax revenues of the two former districts under the provisions of section 99. It should similarly be treated as succeeding to the obligations of the former districts in making contributions to the Fund. Such construction of section 98.6 leaves the Legislature's program for flexibility and local control intact without doing violence to the statutory language. District C did receive state assistance payments in fiscal year 1978-1979 as districts A and B. The payments, ratios, and current allocations should be calculated for the two areas of the former districts and applied to district C.

In the third situation presented by the question, district A and district B received state assistance payments in 1978-1979; in 1985 both districts were consolidated into district C, districts A and B were dissolved, and district C contains an additional area not previously receiving any district services. What contribution should district C now make to the Fund?

6

Consistent with our conclusion with respect to the second situation, we believe that district C should be treated as the successor to the obligations, as well as the rights and benefits, of districts A and B. The territories of the former districts should be considered individually, applying the ratios of each to the property tax revenues now generated by those areas.

As for the area in district C that was not receiving any district services prior to 1985, such area should not be included in the Fund calculations. No state assistance payments were received for this area for the 1978-1979 fiscal year and no contributions were made to the Fund for this area prior to its incorporation into district C. Since the Fund's revenues are to be based upon the state assistance payments received in 1978-1979, tax revenues resulting from assessments in the annexed territory should not be subject to redistribution under the formula of section 98.6.

In the fourth situation presented by the question, districts A and B received state assistance payments for the 1978-1979 fiscal year, and in 1983 a portion of the territory of each was detached to form district C. What, if any, should districts A, B, and C now contribute to the Fund from their property tax allocations?

Districts A and B are receiving a reduced tax allocation due to the detachment proceedings (§ 99). They are no longer serving the area in question for which they received state assistance payments in 1978-1979. This area should therefore not be included in their calculations for Fund contributions.

District C, on the other hand, is now receiving property tax revenues previously allocated to districts A and B. Its area benefited from state assistance payments in 1978-1979, and contributions to the Fund have been made based upon tax assessments in its area. We believe that district C has the responsibility to continue the Fund contributions made by districts A and B for its area. The ratios, state assistance payments, and current allocations based upon assessments in the two separate territories should be calculated and applied to district C's total allocation.

We realize that section 98.6 is complex and that its terms are subject to varying interpretations. We have sought to construe the statutory language in a reasonable and common sense manner. The Legislature's program for flexibility and a measure of local control over the property tax allocations of special districts should not be unreasonably restricted or expanded due to district reorganizations. Our construction of section 98.6 is consistent with the limitations and purposes of the Fund as originally envisioned by the Legislature. Any possible hardships resulting from a district having to contribute to the Fund may be addressed by the board of supervisors at the time of redistribution.

7

In answer to the question presented, therefore, we conclude that special districts are required to contribute to the Fund to the extent that their territories received state assistance payments for the 1978-1979 fiscal year.

*****

8