OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

|  |  |  |
|---|---|---|
| OPINION | : | No. 89-506 |
| of | : | |
| | : | AUGUST 15, 1989 |
| JOHN K. VAN DE KAMP | : | |
| Attorney General | : | |
| | : | |
| RODNEY O. LILYQUIST | : | |
| Deputy Attorney General | : | |
| | : | |

THE HONORABLE CHARLES W. QUACKENBUSH, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following question:

Will the termination of an existing city tax in 1990 as a result of a "sunset clause" enacted in 1985 require a reduction in the amount of property taxes allocated to a city under the terms of Revenue and Taxation Code section 97.35, subdivision (f)(2)?

CONCLUSION

The termination of an existing city tax in 1990 as a result of a "sunset clause" enacted in 1985 will require a reduction in the amount of property taxes allocated to a city under the terms of Revenue and Taxation Code section 97.35, subdivision (f)(2).

ANALYSIS

We are informed that in 1985 a city imposed a "utility users tax" of 3.5 percent upon the charges incurred for the use of electricity and gas by persons in the city. The utility companies serving the city's inhabitants collect the tax from their customers, and the revenues are deposited in the city's general fund. The 1985 city ordinance imposing the tax contained the following provision: "This Article shall automatically be repealed on July 1, 1990." Such a provision is commonly known as a "sunset clause."

The question presented for resolution is whether a city tax imposed in 1985 with a sunset clause terminating the tax in 1990 will affect the city's allocation of property taxes under the terms of Revenue and Taxation Code section 97.35, subdivision (f))(2)[1] beginning in 1990. We conclude that a property tax reduction will be required under the statute.

Section 97.35 provides in part:

_____

[1] All references hereafter to the Revenue and Taxation Code are by section number only.

1. 89-506

" . . . . . . . . . . . . . . . . . . . . . .

"(b)(1)  Except as otherwise provided in this section, each qualifying city shall, for the 1989-90 fiscal year and each year thereafter, be allocated by the auditor an amount determined pursuant to the TEA formula.

" . . . . . . . . . . . . . . . . . . . . . . .

"(f) Notwithstanding subdivision (b), in any fiscal year in which a qualifying city is to receive a distribution pursuant to this section, the auditor shall reduce the actual amount distributed to the qualifying city by the sum of the following:

" . . . . . . . . . . . . . . . . . . . .

"(2) <u>The amount of revenue not collected by the qualifying city in the first fiscal year following the city's reduction after January 1, 1988, of the tax rate or tax base of any locally imposed general or special tax.</u>  The amount so computed by the auditor shall constitute a reduction in the amount of property tax revenue distributed to the qualifying city pursuant to this section in each succeeding fiscal year.  That amount shall be aggregated with any additional amount computed pursuant to this paragraph as the result of the city's reduction in any subsequent year of the tax rate or tax base of the same or any other locally imposed general or special tax.

" . . . . . . . . . . . . . . . . . . . . . .

"(h) The amount not distributed to the tax rate areas of a qualifying city as a result of this section shall be distributed by the auditor to the county.

" . . . . . . . . . . . . . . . . . . . . . ."

(Emphasis added.)

In analyzing the provisions of section 97.35, we first note that the addition of article XIIIA to the Constitution in 1978 caused a substantial reduction in the amount of property tax revenues available to cities, counties, and other local governmental entities.  As a consequence, the Legislature encouraged local governments to seek alternative sources of funding for necessary services, including the imposition of other types of taxes.  (See Gov. Code, § 16270; *Martin Hospital Dist.* v. *Rothman* (1983) 139 Cal.App.3d 495, 499.)

As specified in the Constitution, "[t]he Legislature may not impose taxes for local purposes but may authorize local governments to impose them." (Cal. Const., art. XIII, § 24.)  The Legislature has specifically authorized cities to levy such taxes as sales and uses taxes (§ 7202), transient occupancy taxes (§ 7280), and taxes upon instruments transferring real property (§ 11911).[2]  A utility users tax is imposed by a number of cities.  (See *City of Westminster* v. *County of Orange*,

---

[2]  While a charter city may impose taxes independent of the Legislature's authorization (*California Bldg. Industry Assn.* v. *Governing Bd.* (1988) 206 Cal.App.3d 212, 227-228; *City of Westminster* v. *County of Orange* (1988) 204 Cal.App.3d 623, 631), a general law city has by statute (Gov. Code, § 37100.5) virtually the same authority as a charter city to levy various types of taxes.

*supra*, 204 Cal.App.3d 623; *Fenton* v. *City of Delano* (1984) 162 Cal.App.3d 400; *Campen* v. *Greiner* (1971) 15 Cal.App.3d 836.)

Not only does article XIIIA of the Constitution limit the amount of property taxes available to local governments, it directs the Legislature to allocate the property taxes collected among local governmental entities. (Cal. Const., art. XIIIA, § 1; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 218.) This the Legislature has done by fashioning a statutory allocation formula. (§§ 93-100; *American Canyon Fire Protection Dist.* v. *County of Napa* (1983) 141 Cal.App.3d 100, 105-106.)

Section 97.35 was enacted in 1988 (Stats. 1988, ch. 944, § 6) to adjust this property tax allocation formula for the distribution of property taxes to local governments. It increases the share of a "qualifying city," while it decreases the share of a county, with the county receiving some additional state funds for specified programs. (See Gov. Code, §§ 77000-77301; Pen. Code, § 1463.28.) The formula adjustment is made over a period of years for those counties choosing to participate in the Legislature's program to fund trial courts throughout the state. As explained in the Legislative Counsel's Digest concerning the 1988 legislation:

"Under existing property tax law, provision is made for the allocation by the auditor in each county of property tax revenues to various entities of local government according to specified formulas.

"Under existing property tax law, the auditor in each county with qualifying cities, as defined, is required to make property tax revenue allocations to those cities in accordance with a specified Tax Equity Allocation formula and to make corresponding reductions in the county's property tax revenue allocation. Qualifying cities include those cities, with a single exception for a particular city, which existed but did not levy a property tax in the 1977-78 fiscal year and those cities which incorporated prior to June 5, 1987, and had a property tax revenue allocation for the 1987-88 fiscal year which is less than an amount which would have been received by applying a specified tax rate to its 1987-88 assessed value. Existing law provides for a 10-year phase-in of the allocations to those qualified cities by requiring that the amounts to be allocated to them be distributed as follows: 10% in the 1988-89 fiscal year and increasing by 10% each fiscal year thereafter, subject to their receipt of a minimum allocation of no less than they would have received without the application of the TEA formula. Existing law also prohibits a qualifying city from receiving a property tax revenue allocation pursuant to the TEA formula for any fiscal year in which the county in which it is located fails to notify the state of its intent to opt into the Trial Court Funding Act of 1985.

"This bill would generally revise that procedure and replace it with a formula based generally on a 7-year phase-in rather than a 10-year phase in. . . ."

Subdivision (f)(2) of section 97.35 ties together a qualifying city's receipt of property taxes under the Legislature's formula with the receipt of other types of taxes imposed by the city itself. The increase in property taxes under the 1988 amendment will not occur if the city reduces "the tax rate or tax base of any . . . general or special tax" after January 1, 1988, on a dollar for dollar

basis.[3] As stated in the report of the Senate Rules Committee with respect to the Subdivision (f)(2) limitation when it was proposed in 1988:

"This bill reduces the revenues shifted to qualifying cities in three ways:

"<u>Tax cuts</u>. If a city reduces the rate or base of any general or special tax, then the county auditor must calculate the amount of tax revenue which the city did not collect in the first fiscal year following the reduction. That amount becomes a permanent offset against the city's property tax shift. For example, if a no- or low-property-tax city repealed its utility user tax and reduced local taxes by $1.5 million a year, county officials must subtract that amount from the city's property tax shift. . . ."

The apparent legislative purpose of this subdivision limitation is to discourage a city from considering its new property tax allocation as a substitute for its own municipal tax revenues. A county will not be forced to lose part of its share of property taxes to a city that eliminates other sources of tax revenues.

In applying the terms of section 97.35 to the termination of a city tax under a sunset clause, we are guided by several principles of statutory construction. In *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387, the Supreme Court recently stated:

"Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.]"

The critical date of the subdivision (f)(2) limitation is January 1, 1988. The "city's reduction . . . of the tax rate or tax base" must occur after January 1, 1988, for the limitation to apply. If the city's reduction takes place before January 1, 1988, no decrease in the property tax allocation will be required.

It may be argued that for purposes of the phrase "the city's reduction after January 1, 1988, of the tax rate or tax base," the enactment of a tax ordinance containing its own sunset clause creates the "reduction" at the time of the ordinance enactment, especially in light of the apparent legislative purpose of the limitation. With respect to a tax ordinance with a sunset clause

---

[3] A "general tax" is one levied for general governmental purposes, while a "special tax" is imposed for specific purposes. (Gov. Code, §§ 50076, 53721; *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 57; *California Bldg. Industry Assn.* v. *Governing Bd.*, *supra*, 206 Cal.App.3d 212, 235; *Fenton* v. *City of Delano*, *supra*, 162 Cal.App.3d 400, 408.) The significant difference between the two is that a special tax may not be imposed by a local government without first obtaining the approval of two-thirds of the voters of the area voting on the issue. (Cal. Const., art. XIIIA, § 4; Gov. Code, §§ 50077, 53722.) Since the utility users tax in question is deposited in the city's general fund, it would not be subject to the two-thirds voter approval requirement.

enacted in 1985, for example, it cannot be said that the choice to eliminate the city tax was due to the Legislature's change in the property tax allocation formula in 1988. The city cannot be characterized as making its choice to reduce municipal taxes at the "expense" of the county government; the city council voted to reduce (eliminate) the tax without expecting any property tax shift from the county.

On the other hand, it may be argued that the actual reduction of a tax by the enactment of a tax ordinance with a sunset clause does not occur until the sunset clause becomes operative. A tax that is repealed on July 1, 1990, for example, under a sunset clause will cause elimination of the tax base and tax rate on the specified date and not before. The tax "reduction" is caused not only by enactment of the sunset clause, but by the failure to repeal the sunset provision prior to its operative date.

While both arguments have merit, we believe that a "city's reduction . . . of the tax rate or tax base" by enacting a tax ordinance with a sunset clause does not occur for purposes of section 97.35 until the sunset clause becomes operative. Under the utility users tax ordinance in question, the tax rate and tax base will be reduced on July 1, 1990; no reduction will occur before that date. The critical factor is that the city retains the power to change its decision at any time prior to the operative date of the sunset clause. The reduction will not occur if the sunset clause is repealed. A county should not be expected to lose its allocation under the new formula to a city that refuses to act. The term "reduction" in subdivision (f)(2) of section 97.35 may reasonably be construed here to include legislative action (enactment of a sunset clause) together with legislative inaction (failure to repeal the clause) without doing violence to the statutory scheme as a whole.

In answer to the question presented, therefore, we conclude that the termination of an existing city tax in 1990 as a result of a sunset clause enacted in 1985 will require a reduction in the amount of property taxes allocated to a city under the provisions of section 97.35, subdivision (f)(2).

* * * * *