[No. D012621. Fourth Dist., Div. One. Jan. 7, 1992.]

CARLSBAD MUNICIPAL WATER DISTRICT, Plaintiff and Respondent,
v.
QLC CORPORATION, Defendant and Appellant.

**COUNSEL**

Bernard J. Karwick and Howard E. Fields for Defendant and Appellant.

Jennings, Engstrand & Henrickson and Richard G. Opper for Plaintiff and Respondent.

**OPINION**

**TODD, J.**—QLC Corporation, formerly Community Resources Corporation, (CRC), appeals a money judgment in favor of Carlsbad Municipal Water District, formerly Costa Real Municipal Water District, (District), in the amount of $95,400 plus interest representing District's charge to CRC for a 300-unit condominium development under the authority of a District resolution, Resolution No. 439, imposing a "Major Facilities Charge" (MFC).[1] The trial court's judgment was based on its finding the MFC was a permissible "user fee" rather than a "special tax" subject to the two-thirds vote requirement of article XIII A, section 4, of the California Constitution (Proposition 13).

CRC asserts the District's resolution is invalid because it imposes development fees nominally necessitated by new development but explicitly permits District to expend those fees for wholly unrelated purposes in derogation of Proposition 13. CRC further asserts the resolution is invalid because, by including fees for unrelated and arbitrarily conceived revenue

---

[1]During the appeal the Carlsbad Municipal Water District was substituted as a party for the Costa Real Municipal Water District and QLC Corporation was substituted as a party for Community Resources Corporation. For convenience only we refer to the parties by their original names in the lawsuit.

purposes, it constitutes a special tax which was not adopted by the electorate as required by Proposition 13. CRC also claims entitlement to attorney's fees under the private attorney general doctrine. We affirm the judgment.

FACTS

This is CRC's second appeal in the case. In the first appeal CRC successfully challenged the trial court's granting a summary judgment in favor of District. (*Costa Real Municipal Water Dist.* v. *Community Resources Corp.* (Mar. 29, 1989) D007777 [nonpub. opn.] (*CRC I*).) In *CRC I* this court overturned the summary judgment on the basis District had failed to present competent, admissible evidence to show both the estimated costs of the new projects and District's basis for determining the amount of the fee allocated to CRC as required under *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227 [211 Cal.Rptr. 567] to prove the MFC is a service or user fee and not a special tax under Proposition 13. Thus, the District was not entitled as a matter of law to summary judgment on its cause of action to collect the MFC.

In *CRC I* the underlying facts are set forth as follows:

"The uncontradicted facts in the record show CRC purchased certain partially improved real property known as Pueblo De Oro in Carlsbad, California, on April 13, 1983. At the time of the sale, Pueblo De Oro had final map approval for construction of a condominium development on its site and all streets and utilities were completed, the water lines were in place, the meters were installed and the water was in use for maintenance purposes. No building permits, however, had yet been issued.

"On June 24, 1983, CRC submitted its plans for development of Pueblo De Oro and applied to the City of Carlsbad for building permits to construct 300 units. Such were issued in September and October 1983.

"In January 1984, CRC was notified by letter it owed $95,400 for water service because of its new construction. The January 24, 198[4], letter from Costa Real advised CRC this charge was levied pursuant to Resolution No. 439 (Resolution), effective August 1, 1983, and determined by 'application of the equivalent dwelling unit (EDU) formula utilized by the City of Carlsbad and . . . payable at the time of issuance of a building permit.' The amount CRC owed was determined on the basis of a $300 fee per EDU. [¶] CRC refused to pay the MFC and Costa Real subsequently sued CRC for money damages."

After the remittitur in *CRC I*, the parties entered a stipulation reading in pertinent part:

"1) The [MFC] adopted by the [District] pursuant to Resolution 439, adopted by the Board of Directors of the Water District on July 20, 1983, does not exceed the reasonable cost of providing the service for which the fee is charged; and

"2) The basis for determining the amount of the fee allocated to the developer defendant herein bears a fair and reasonable relationship to the developer's benefit from the fee."

Under the stipulation the trial was limited to the legal sufficiency and enforceability of Resolution No. 439 together with the other issues and defenses set forth in the pleadings, subject to the law of the case established in *CRC I.*

Resolution No. 439 provides in part:

"1. The public interest, health and general welfare of the [District] and its inhabitants require the acquisition and construction of water facilities and systems necessary to service new and altered structures within the boundaries of [District] and the public interest and economy require that, in order to provide funds for such purposes, there be established certain connection charges to be paid by the owner or owners of land upon which such structures are constructed or altered, such connection charges to be known as 'Major Facilities Charge' and 'Direct Connection Surcharge'.

"2. A Major Facilities Charge is hereby established under the following terms and conditions:

"a. In addition to all other charges established by ordinances, resolutions and rules and regulations of [District], there is hereby established a connection charge, to be known as 'Major Facilities Charge', to be applied to any new water service or altered water service requirement within the boundaries of [District].

"b. The Major Facilities Charge shall be an amount per equivalent dwelling unit (EDU) as hereinafter identified. The amount of the Major Facilities Charge per EDU shall be [$300 per unit in the case of CRC's 300-unit development].

"  . . . . . . . . . . . . . . . . . . . . . . . .

"6. There is hereby created a Capital Development Fund into which all funds collected under this Resolution shall be deposited. The monies in such

Capital Development Fund shall be used solely for the acquisition and construction of water facilities and systems, to repay principal and interest on bonds issued for the construction of such water facilities and systems and to repay federal or state loans or advances made to the [District] for the construction of such water facilities and systems."[2]

The trial court found:

"1.  That the stipulations of the parties filed herein on April 11, 1990 concerning the major facilities charges removed the triable issue of fact addressed in the appeal of the summary judgment in case D007777 filed in the Court of Appeal, Fourth Appellate District, Div. 1, on March 29, 1989.

"2.  That as a matter of law Resolution 439 is not prohibited by Proposition 13 as a 'special tax', but rather constitutes a permissible 'user fee'.

"3.  The terms of Resolution 439 are not vague and ambiguous so as to support the argument that funds generated thereby could be used for purposes other than the acquisition and construction of facilities necessitated by new development."

On the basis of these findings, the trial court entered judgment for District against CRC in the amount of $95,400, plus interest from January 24, 1984.[3]

DISCUSSION

Article XIII A, section 4, of the California Constitution reads:

"Cities, counties and special districts, by two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad

---

[2]Paragraph 2 of Resolution No. 439 also provides: "e. Where it is proposed to alter a structure in any way which results in a greater potential water demand therefor, or to change or replace an existing water meter by a meter of a larger size, the number of EDU's, both prior and subsequent to such alteration or change of meter size shall be determined pursuant to the provisions of paragraph (d) hereinbefore, and a Major Facilities Charge based on the difference between the units applicable prior to such alteration or change of meter size shall be paid. The charge provided for in this section shall be deemed a Major Facilities Charge for purposes of this Resolution, even if a new physical connection of a structure is not required and the continuance of the original physical connection is conditioned on payment of the charge provided for in this section.

"f.  No Major Facilities Charge shall be payable when an existing water meter is replaced by two meters, solely to provide for the separate metering of landscape irrigation. Sizing of meters installed pursuant to this section shall be within the sole discretion of the District General Manager."

[3]Apparently the judgment pertains to a total of 318 units for which CRC admitted in its answer it had been issued building permits. (See *CRC I, supra,* D007777.)

valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

In order to provide all cities and counties with the authority to impose special taxes under this provision of Proposition 13 (Gov. Code,[4] § 50075), the Legislature enacted section 50076, reading:

"As used in this article, 'special tax' shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes."

■ A development fee may be treated as a special tax subject to the two-thirds vote requirement of Proposition 13 "only . . . when one or both of the conditions set out in that section [50076] are found to exist, that is, (1) the fee exceeds the reasonable cost of providing the service or the regulatory activity for which it is charged or (2) the fee is levied for general revenue purposes." (*California Bldg. Industry Assn.* v. *Governing Bd.* (1988) 206 Cal.App.3d 212, 236 [253 Cal.Rptr. 497].)

The parties' stipulation that the MFC does not exceed the reasonable cost in providing the service for which the fee is charged removes the possibility of the MFC being considered a special tax on the basis of the first criterion.[5] ■ Thus, CRC's argument derives from its assertion the MFC runs afoul of the second aspect pertaining to fees levied for general revenue purposes.

■ The determination of whether a particular fee is a development fee or a special tax is a question of law. (*Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496, 1504 [246 Cal.Rptr. 21].) Establishing that the fee fits the exception of section 50076 to the broad constitutional restriction on the power of local agencies to impose special taxes is the burden of the local agency. (*Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.*, *supra*, 165 Cal.App.3d 227, 235.) ■ Typically, a development fee is an exaction imposed as a precondition for the privilege of developing land, commonly exacted in order to lessen the adverse impact of increased population generated by the development. (*Russ,*

---

[4]All statutory references are to the Government Code unless otherwise specified.

[5]We note it has been said that the fact a fee may contravene a provision such as section 50076's requirement the fee not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged does not necessarily cause it to be a special tax. To reach such a conclusion has been described as "reverse logic" under the rule that "[i]f the fee is not the type of exaction which [California Constitution,] article XIII A was designed to reach, then resort to sections 50075-50077, the enabling legislation for the article, is unnecessary." (*Alamo Rent-A-Car, Inc.* v. *Board of Supervisors* (1990) 221 Cal.App.3d 198, 205-206 [272 Cal.Rptr. 19].)

*supra,* 199 Cal.App.3d at p. 1504.) On the other hand, special taxes as defined in Proposition 13 (Cal. Const., art. XIII A, § 4) are "taxes . . . levied for a specific purpose rather than . . . a levy placed in the general fund to be utilized for general governmental purposes." (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 57 [184 Cal.Rptr. 713, 648 P.2d 935].) The term "special taxes" must be strictly construed and ambiguities resolved so as to limit the situations to which the two-thirds requirement applies because of the inherently undemocratic requirement that the tax must be approved by a supermajority of the electors. (*Farrell, supra,* 32 Cal.3d at p. 52.) As stated in *Russ, supra,* 199 Cal.App.3d at page 1505:

"One characteristic of a special tax is that it levies a fee to replace revenue for services which were affected by the reduction caused by article XIII A. [Citations.] In contrast, the transit fee imposed by the Ordinance [in that case] is not intended to replace revenues lost as a result of article XIII A. It is triggered by the voluntary decision of the developer to construct office buildings and is directly tied to the increase in ridership that this construction will possibly generate."

Another statement of the rule is:

" '[S]pecial taxes' under article XIII A, section 4 of the California Constitution do not embrace fees for land-use regulatory activities where the fees charged to particular applicants do not exceed the reasonable cost of the regulatory activities and are not levied for unrelated revenue purposes." (*Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 663 [166 Cal.Rptr. 674].)

The sole case authority on which CRC relies for its argument on this appeal is an alternative basis for the decision in *Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208, 1219-1220 [265 Cal.Rptr.347], and more particularly, a strongly worded two-sentence paragraph applied to the fee there under consideration:

"We asked the parties if the ordinances as enacted were overly broad. Plaintiff asserts that they are and we are compelled to agree that the Fire Hydrant Fee Ordinances, as they presently read, *do not* contain language which limits the use of the fire hydrant fees and the fund established by the ordinances to solely those installations and repairs necessitated by new development, although such limitation is mandated by the California Constitution." (*Ibid.*)

After rejecting the argument of the City of Los Angeles that it was enough to comply with Proposition 13 that its administrative interpretation of the

ordinances was as if they contained the appropriate limitation of use of the funds for new development, *Bixel* observed, "Nowhere within the ordinances, or in the new municipal code section or the administrative code section has this court found adequate words of limitation." (216 Cal.App.3d at p. 1220.) *Bixel* recognized that a new development may not only necessitate new installations but may require upgrading of installations already in place in order to maintain an adequate level of public service for everyone. (*Ibid.*) However, *Bixel* said that allocation of the burden of the fee between the old and the new, though difficult, also "is mandated by the California Constitution." (*Ibid.*) *Bixel* concluded the ordinances there in question "do not contain language embodying the required constitutional safeguards which must be employed in fashioning a valid development fee, and are constitutionally invalid for that reason." (*Ibid.*)

*Bixel* was concerned with a $135,520 fire hydrant fee charged after it was determined the new office building development would require two new fire hydrants costing $16,800. (216 Cal.App.3d at pp. 1211, 1214.) After the fee was paid under protest and during the litigation, the City of Los Angeles told the court the Interstate Bank building fire in May 1988 resulted in a determination a water main also needed upgrading to properly service and protect the new office building. The water main upgrading would cost an estimated $994,000. However, it was established there was no precise plan to upgrade the water main, the water main would be replaced eventually by a main no larger than the existing main and the present main was 97 years old and should have been replaced 47 years before. (216 Cal.App.3d at p. 1214.)

It was in this context *Bixel* held that the ordinances were invalid not only for lack of proper limiting language pertaining to use of the fees and allocation of the fees between old and new needs due to development, but also because the city did not fulfill its burden of showing "that the method used to determine the amount of the fire hydrant fee bore a fair and reasonable relation to the developer's benefit from the fee."[6] (216 Cal.App.3d at p. 1219.) It is not clear from the discussion in *Bixel* that the court also viewed the fire hydrant fee there involved as imposing a special tax under section 50076 because it exceeded the reasonable cost of providing the service for which the fee was charged. However, it is appropriate to read the case as also deeming the ordinances invalid for violating the "excess

---

[6]The second aspect of the stipulation in the present case, that the basis for determining the amount of the MFC bears a fair and reasonable relationship to the developer's benefit from the fee, removes the MFC from a challenge based on any asserted absence of such a fair and reasonable relationship.

cost" provisions of law necessitating a two-thirds vote of the people for approval.[7]

The ordinances in *Bixel* established a named fund for the deposit of the fire hydrant fees for purposes of disbursement as permitted by a specified section of the city's administrative code. (216 Cal.App.3d at p. 1213.) The administrative code section permitted the use of the money in the fund for " '*initial installation of fire hydrants, fire hydrant upgrades, and upgrades, improvements or replacements of existing water mains consistent with the Safety Plan and Fire Protection Plan elements of the General Plan.*' " (*Id.* at p. 1214, italics in original.) The fire protection and prevention plan was "very general in scope, and contains no specific directives concerning limitations placed on the expenditure of funds from the fire hydrant fund." (*Ibid.*) The record on appeal did not contain the safety plan mentioned in the administrative code section. A city employee's declaration stated that expenditures out of the fund "represent hydrant and main installations and replacements required to offset the additional fire burden generated by new development," and that another fund, the city general fund, is used to fund projects generated by existing customers in the city. (*Ibid.*) It was on these underlying facts that *Bixel* found the ordinances overly broad.

Resolution No. 439 obviously bears no resemblance to the ordinances and fee involved in *Bixel*. The District's resolution does not contravene the "reasonable cost" and "fair and reasonable relationship" limitations on such fees that are set forth in the statutes and case law. Further, only by violating fundamental rules of statutory construction[8] does CRC justify its argument that Resolution No. 439 is overbroad because of a lack of language limiting

---

[7]This reading of *Bixel* is appropriate considering the disparity between the $16,800 cost of the 2 new hydrants and the $135,520 fee charged, as well as the court's expression of concern with the city's plan to attribute the cost of replacing the 97-year-old water main to the developer's presence on the street on which the main was located, even though it was established the main should have been replaced 47 years earlier.

In addition to quoting section 50076, *Bixel* quoted section 54990, the substance of which is now in section 66013, subdivision (a), providing in pertinent part: "Notwithstanding any other provision of law, when a local agency charges fees for zoning variances; zoning changes; use permits; building inspections; *building permits*; . . . those fees shall not exceed the estimated reasonable cost of providing the service for which the fee is charged, unless a question regarding the amount of the fee charged in excess of the estimated reasonable cost of providing the services or materials is submitted to, and approved by, a popular vote of two-thirds of those electors voting on the issue."

When enacting section 54990, the Legislature found and declared: "[A]s a matter of statewide concern it is necessary for the state to limit the amount of various fees charged by local agencies, including, but not limited to, charter cities, in order to carry out the intent and purpose of Article XIII A of the California Constitution." (Stats. 1981, ch. 914, § 1, p. 3456.)

[8]Both parties agree that the canons of statutory construction apply to the construction of Resolution No. 439.

the use of the fees and the fund to solely those installations and repairs necessitated by new development.

Before discussing the main aspect of this case, proper construction of Resolution No. 439, we point out CRC is given to misinterpretation in its apparent emphasis on the language of *Bixel* referring to "new" development as if only new development would justify an ordinance of the type here in question. *Bixel* used that terminology in the context of the stated intent of the ordinances there under consideration "that the cost of providing new services would be spread among all *new developers*," (*Bixel, supra*, 216 Cal.App.3d 1208, 1213, italics added), and the repeated assertion of the City of Los Angeles "that the fire hydrant fees were created from *new development* for *new development*." (*Id.* at p. 1217, italics added.) In this context *Bixel* drew its major conclusions concerning such matters as the lack of a fair and reasonable relationship between the fee imposed, on the one hand, and the developer's benefit from the fee or the burden posed by the development, on the other hand. (*Id.* at p. 1219.) The same is true of *Bixel's* statement about the absence of language in the ordinance limiting use of the funds solely to "installations and repairs necessitated by new development." (*Id.* at pp. 1219-1220.) This language, used in the context of the ordinance being considered, assertions made and other cases actually involving new development, is not to be read as holding that only where new development is involved can a fee ordinance otherwise meeting the appropriate tests be upheld.

■ Particular clauses or sections of an enactment must be considered " 'in the context of the statutory framework as a whole.' " (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722], quoting *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; see also *Kelly* v. *Robinson* (1986) 479 U.S. 36, 43 [93 L.Ed.2d 216, 225, 107 S.Ct. 353], " ' " ' 'we must . . . look to the provisions of the whole law, and to its object and policy.' " ' " )

■ In contravention of this rule, CRC's argument focuses alone on paragraph 6 of Resolution No. 439 and its language referring to use of the moneys in the fund "solely for the acquisition and construction of water facilities and systems, to repay principal and interest on bonds issued for the construction of such water facilities and systems and to repay federal or state loans or advances made to the [District] for the construction of such water facilities and systems." Viewed in isolation, paragraph 6 does not restrict expenditures from the fund to those necessitated by the new development. However, paragraph 6 must be read in conjunction with Resolution No. 439 as a whole, and particularly paragraph 1 as well as the purpose of the

resolution to provide funds for "require[d] . . . acquisition and construction of water facilities and systems *necessary to service new and altered structures*" within the District. (Res. No. 439, par. 1, italics added.) When read in this light, the reference in paragraph 6 to "water facilities and systems" must be deemed to mean those water facilities and systems *necessary* to service new and altered structures.

There is no suggestion in the language of the resolution as a whole that a more expanded meaning of paragraph 6 was intended. On the contrary, there is language in Resolution No. 439 demonstrating the purpose of the resolution's drafters to limit the use of the fund to acquire or construct water facilities and systems that are required or necessary due to new or altered development resulting in increased demand for those facilities or systems. That language includes references to such matters as "new and altered structures" in the context of the words "require" and "necessary," (par. 1), "new water service or altered water service requirement," (pars. 2a, 3a), and proposals "to alter a structure in any way which results in a greater potential water demand therefor, or to change or replace an existing water meter by a meter of a larger size" (pars. 2e, 3d). Contrary to CRC's argument, Resolution 439 does not include fees "for unrelated and arbitrarily conceived revenue purposes."

Nor does Resolution No. 439's language, reasonably construed, permit the District to impose an MFC where only an "alteration" is involved even though the alteration does not represent a potential for increased use of the District's water facilities and systems. The phrase "water facilities and systems *necessary* to service new and altered structures" (par. 1, italics added) is reasonably to be viewed as the initial, controlling point of reference for following phrases referring to "such structures are constructed or altered" (par. 1), "altered water service requirement" (par. 2) and "alter a structure" (par. 2e). The latter phrase, "alter a structure," is itself expressly limited by the phrase "in any way which results in a greater potential water demand therefor," thus demonstrating that potential *increased* use of water is the requisite justifying basis for imposition of the MFC in any case.

We conclude that when properly construed with the resolution as a whole, there is no overbreadth in Resolution No. 439's provision regarding the expenditure of the funds.[9] Our conclusion that the MFC may be imposed in the case of any construction or alteration only where that construction or alteration carries a real potential for increased use of water is fully consistent with *Bixel, supra,* 216 Cal.App.3d 1208, 1219-1220.

---

[9] A corollary to this conclusion is that the separate fund provided for in Resolution No. 439 comports with the requirement of section 53077 (now § 66006, subd. (a)) that local agencies collecting development fees "expend those fees solely for the purpose for which the fee was

Much as in the case of the transit fee involved in *Russ, supra,* 199 Cal.App.3d 1496, 1505, the MFC fee here is not intended to replace revenues lost as a result of Proposition 13; it is triggered by the voluntary decision of the developer to develop the 300-unit condominium complex and it is directly tied to the increase in use of water facilities and services likely to be generated by the development. (See also *J. W. Jones Companies* v. *City of San Diego* (1984) 157 Cal.App.3d 745, 758 [203 Cal.Rptr. 580].) What is involved here is a development fee, not a special tax. No two-thirds vote requirement attaches to Resolution No. 439.[10]

### DISPOSITION

Judgment affirmed.

Kremer, P. J., and Wiener, J., concurred.

---

collected." We note section 53077 was enacted after Resolution No. 439 was adopted and thus is not determinative here.

[10]This conclusion moots CRC's request for attorney fees under the private attorney general doctrine.