[No. B055523. Second Dist., Div. Five. May 25, 1993.]

RICHARD K. EHRLICH, Plaintiff and Appellant, v.
CITY OF CULVER CITY et al., Defendants and Appellants.

**COUNSEL**

Lisa S. Ehrlich and Edward J. Horowitz for Plaintiff and Appellant.

Ronald A. Zumbrun, Edward J. Connor, Jr., and Timothy A. Bittle as Amici Curiae on behalf of Plaintiff and Appellant.

Norman Y. Herring, City Attorney, Evelyn Keller and Carol Schwab, Deputy City Attorneys, Kane, Ballmer & Berkman, Joseph W. Pannone and Michael D. Montoya for Defendants and Appellants.

## OPINION

**GRIGNON, Acting P. J.**—This case involves the imposition of two fees on a developer by a municipality as conditions of approval of a development project: (1) a $280,000 fee to mitigate the impact of a land-use change (the mitigation fee); and (2) a $33,220 fee in lieu of a requirement that art be placed on the development project (the in lieu art fee). The City of Culver City, the City Council of Culver City and members of the City Council of Culver City (collectively the City) appeal from the judgment of the trial court issuing a writ of mandate invalidating the mitigation fee imposed by the City against Richard K. Ehrlich (the developer)[1] in exchange for approval of a 30-unit townhome development located in the City (the development project). The City contends the mitigation fee was a constitutionally permissible monetary exaction reasonably related to a legitimate public purpose. The developer contends the mitigation fee was an unconstitutional taking of his property, which did not substantially advance a legitimate public purpose directly related to the approval of the development project. The City also contends the trial court erred by releasing its lien against the developer's property and in awarding the developer attorney fees pursuant to Code of Civil Procedure section 1036.

The developer cross-appeals from the judgment of the trial court denying his petition for writ of mandate to invalidate the imposition of a monetary exaction in the form of the in lieu art fee in exchange for approval of the development project. He also appeals from the denial of his request for attorney fees pursuant to Government Code section 800 and Code of Civil Procedure section 1021.5.

### FACTS

The property in question consists of 2.4 acres located at 4901 Overland Avenue in Culver City (the property). Prior to October 28, 1974, the property was owned by the developer's predecessor in interest and was split-zoned R-1 (single-family dwelling) and C-2 (retail commercial). On October 28, 1974, at the request of the developer's predecessor in interest, the zoning was changed to C-3 (commercial) and a specific plan was adopted

---

[1]Richard K. Ehrlich is the trustee of certain family trusts which are the actual owners of the subject property.

providing for the development of a sports facility, a private tennis club and recreational facility. The developer's predecessor in interest did not develop the property, but leased it to the City for use as a little league baseball field.

In 1975, the developer purchased the vacant property. The developer subsequently improved the property and operated it as a private tennis club and recreational facility. The recreational facility included a heated swimming pool, a jacuzzi, a sauna, five tennis courts, three paddle tennis courts, a jogging track, an aerobics area and a building with lockers, a kitchen and other accessory uses. The estimated value of the improvements was $800,000. The private tennis club was not a financial success. In 1981, the developer applied to the City for changes to the property's land-use restrictions to permit the construction of an office building. This application was denied by the City on the ground that the existing private tennis club facility provided needed recreational facilities for the City.

On August 30, 1988, the developer closed the private tennis club and, subsequently, donated to the City much of the movable equipment associated with the tennis club.

In September 1988, the developer applied to the City for changes to the property's land-use restrictions to permit construction of 30 deluxe townhomes valued at $10 million. The City denied the application in April 1989 on the ground that the land-use restrictions provided needed recreational facilities for the City.

On July 7, 1989, the developer filed a petition for writ of mandate and complaint for damages. In the meantime, the developer sought to obtain the City's reconsideration of its denial. Apparently, the developer offered to build four tennis courts in exchange for approval of the development project. In August and September 1989, the City reconsidered its former denial and approved the development project, subject to certain conditions including the payment of the $280,000 mitigation fee, the $30,000 in lieu parkland fee, and the $33,220 in lieu art fee. On November 3, 1989, the developer amended the complaint. In January 1990, the City and the developer agreed that, in exchange for the City's approval of the development project, the developer would pay the $280,000 mitigation fee for the loss of recreational facilities to the City occasioned by the changes in the land-use restrictions. The developer, however, retained the right to judicially challenge the validity of the mitigation fee. The developer also agreed that the City would obtain a lien upon the property as security for payment of the mitigation fee.

### PROCEDURAL BACKGROUND

In his petition and complaint, the developer sought: to set aside the $280,000 mitigation fee and the $33,220 in lieu art fee; related declaratory

relief; just compensation for the taking of his property; and damages for violations of his civil rights. The petition for writ of mandate was bifurcated from the balance of the complaint. On August 14, 1990, the hearing on the petition for writ of mandate was heard by the trial court. On September 6, 1990, the trial court issued its ruling on the petition. The trial court invalidated the $280,000 mitigation fee: "The stated purpose of [the $280,000 mitigation fee] is to 'replace' tennis courts no longer available in the community due to the closing of [the developer's] private tennis club. [¶] [The developer's] club (although most likely a public accommodation for civil rights purposes) was at all times private property; the [C]ity never owned any interest in it nor was any part of it ever dedicated to public use. It is conceded that [the developer] had no obligation to maintain his facility available for public use, but rather that [the developer] retained the right to exclude the public from his premises. It is true that the public accommodation laws would essentially require [the developer] to make the facilities available to the public generally so long as the premises were operated as a business, but there was no requirement that [the developer] operate the premises as a business. Instead, [the developer] was at all times free to go out of business, which he in fact did. [¶] There is . . . no reasonable relation . . . between [the developer's] project and the need for public tennis courts in [the City]. [¶] In this case, [the developer's] actions cannot legally be said to deprive the City of tennis courts, because neither did [the developer] have an affirmative duty to provide tennis courts to the City or its residents nor would tennis courts necessarily be available to the City but for [the developer's] project. ([The developer] was at all times free to discontinue business as a tennis club, and in fact did so). The City's [$280,000 mitigation fee] is . . . simply an effort to shift the cost of providing a public benefit to one no more responsible for the need than any other taxpayer. [¶] The City could have condemned a portion of [the developer's] property for use as City tennis courts, but the City would then of course have had to pay for the land. Here, instead of taking land for which it would have had to pay, the City proposes to take not land but money. This is equally impermissible." The trial court found the $280,000 mitigation fee constituted an unequal tax discriminatorily applied and a taking of private property without compensation.

The trial court refused to invalidate the in lieu art fee and refused to award attorney fees.

On December 12, 1990, the trial court modified its ruling to provide that the lien securing payment of the $280,000 mitigation fee be removed by the City no later than January 7, 1991. On January 4, 1991, the City filed its notice of appeal and a fully executed release of lien with the trial court. On

January 15, 1991, the trial court again modified the judgment by declaring the lien null and void and ordering the clerk of the court to record the release of lien. On January 17, 1991, the City filed a notice of appeal from this modification of the judgment. On February 8, 1991, the trial court awarded the developer sanctions against the City pursuant to Code of Civil Procedure section 128.5 in the amount of $5,804.75 for the City's failure to timely remove the lien. On February 25, 1991, the trial court awarded the developer costs including attorney fees pursuant to Code of Civil Procedure section 1036 in the amount of $69,195.25. The City filed a notice of appeal from the award of costs and attorney fees.

## DISCUSSION

### I.  *The $280,000 Mitigation Fee*

On September 30, 1988, the developer applied to the City for a general plan amendment, zone change, adoption of a new specific plan, tentative tract map, and design and physical development plan amendment.

After receiving the developer's applications, the City initially considered acquiring the developer's property by eminent domain. In connection with this possibility, a feasibility study was prepared for the City concerning the economic feasibility of the recreational facilities on the property. The report concluded that the inconsistency of management and problems of upkeep were contributing factors to the financial problems of the facility. The report also concluded that the design concept and use of space at the facility were inefficient, inadequate, and not well-suited to the current fitness market. The report further concluded: "Based on the demographics and the existing clubs in the area, we believe there is a strong market for a full scale, community family health and fitness center. The clubs that are attempting to serve this market tend to specialize or provide only a partial offering of services and activities in demand. We saw no concerted effort to tap emerging senior or children's fitness markets or overt attempt to provide services to the rapidly expanding business community. All things considered, there appears to be considerable unmet demand in the Culver City area." Finally, the report concluded that the facility could be run in an economically feasible manner if certain improvements were made to the facility.

The City initially denied the developer's applications on April 10, 1989, on the ground that the existing land-use restrictions on the property were needed by the community. Correspondence from the City's human services director had indicated the property had a history of community recreational use and a land-use change would negatively impact the availability, whether public or private, of community recreational facilities in the City.

The developer sought to have the City reconsider its denial and offered, as a compromise, to build four unlit tennis courts elsewhere in the City to replace the recreational facilities which might be lost on the property. The City determined that replacement costs for the recreational facilities which had been on the property were as follows: pool—$250,000 to $280,000; paddle tennis courts—$135,000 to $150,000; and tennis courts—$275,000 to $300,000. On August 28, 1989, the City adopted ordinances approving an amendment to the general plan, amending the design and physical development plan, approving the tentative tract map, and requiring the payment of a $30,000 in lieu parkland fee. The minutes of a meeting of the City Council held on August 28, 1989, state: "In addition to all other approvals recommended by the Planning Commission, a fee of $280,000.00 should be required. This fee will be used to pay for replacement of community recreational facilities which are currently provided for by the land use permitted on the subject site, which will be removed pursuant to this approval. [¶] The need for community recreational facilities has been evidenced by previous staff reports, consultant reports, and public testimony indicating the use and feasibility of such facilities at the subject site. [¶] Staff reports indicated the existing permitted recreation facilities, consisting of tennis courts, paddle tennis courts, swimming pool, running track, aerobics area, jacuzzi, sauna, and related sports club amenities, had an estimated value of at least $800,000.00. Based on the developer's estimated value of the proposed residential project of $10,000,000.00 and in lieu of imposing the developer's proposal to build four tennis courts as a condition of approval of this project, a fee of $280,000.00 for partial replacement of the lost recreational facilities is a reasonable imposition in order to protect the public health, safety, and welfare."

On September 11, 1989, the City adopted an ordinance rezoning the property from C-3 (commercial) to R-3a (low-density multiple family dwelling) and approved the new specific plan, subject to an additional condition. The ordinance provided, "Prior to issuance of any temporary or final Certificate of Occupancy for the proposed project, the developer shall pay to the City the amount of $280,000.00 to be used for additional recreational facilities as directed by the City Council."

In January 1990, the developer and the City entered into an agreement for lien for developer's fees. This agreement provided in pertinent part:

"WHEREAS, as a condition of approval for development of the Project, and to mitigate for the loss of needed community recreational facilities existing on the Site, construction of the Project was conditioned on Developer's payment to City of fees to be used for additional recreational facilities . . . .

[¶] Now, THEREFORE, the parties . . . do hereby agree as follows: 1. Developer agrees, as a condition of issuance of the grading and building permits for the Project, to pay to City the sum of Two Hundred Eighty Thousand Dollars ($280,000.00), in accordance with the provisions of this agreement. [¶] 2. Developer shall be required to make the entire payment of $280,000.00 in cash to the City Treasurer on or prior to the date any Certificate of Occupancy for any townhouse condominium unit is issued. [¶] 3. Developer agrees to make the above-stated payment under protest. Nothing in this agreement shall in any way waive or restrict Developer's rights to pursue any protest Developer has made under Government Code § 66008 and by the above-mentioned lawsuit and to have a court of competent jurisdiction determine what amount, if any, should be refunded to developer. [¶] 4. City shall use said $280,000.00 only for additional recreational facilities, as directed by the City Council."

## A. Unconstitutional Taking

The City contends the trial court erred in finding that the $280,000 mitigation fee constitutes the unconstitutional taking of private property without just compensation. The developer responds that the $280,000 mitigation fee constitutes an illegal permit condition resulting in an unconstitutional taking of his property. Specifically, developer argues the validity of the mitigation fee must be determined under the two-pronged test set forth in *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141]: (1) the government agency could have denied the request without the denial constituting a taking; and (2) the condition imposed substantially furthers the government goal furthered by a denial. The developer argues that the mitigation fee does not meet either prong of this test. He asserts the denial of the specific plan amendment by the City would have constituted a taking and there is no nexus between the mitigation fee and the development project. We will consider initially the first prong of the *Nollan* test.

"[L]and-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land' [citation]." (*Nollan* v. *California Coastal Comm'n, supra,* 483 U.S. at p. 834 [97 L.Ed.2d at p. 687].) Land-use regulations effect a taking and are, therefore, compensable, if the regulations compel the property owner to suffer even a minute physical invasion of his or her property or the regulations deny the owner of property "all economically beneficial or productive use of land." (*Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. __ [120 L.Ed.2d 798, 813, 112 S.Ct. 2886, 2893].) A land-use regulation which merely deprives the owner of the property's

most profitable use does not effect a taking. (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 125-138 [57 L.Ed.2d 631, 648-657, 98 S.Ct. 2646].) A regulation which deprives land of all economically benefi- cial use does not effect a compensable taking if "the proscribed use interests were not part of [the property owner's] title to begin with." (*Lucas* v. *South Carolina Coastal Council, supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 820, 112 S.Ct. at p. 2899].) In determining whether land-use regulations effect a compensable taking, the owner's reasonable investment-backed expectations are to be taken into account. (*Penn Central Transp. Co.* v. *New York City, supra*, at p. 124 [57 L.Ed.2d at p. 648].)

■ In this case, the developer contends the land-use regulations requir- ing the property to be used as community recreational facilities deprived him of all economically beneficial use of the property. He bases this contention on the evidence that he had been unable to operate the existing facility at a profit over a number of years. He argues that since the land-use restrictions deprived him of all economically beneficial use, maintaining the restrictions would have constituted a compensable taking, and, therefore, the City had no choice but to give him permission to build his luxury townhome project. These arguments are seriously flawed.

First, the trial court did not find that the land-use regulations to which the property was subject deprived the developer of all economically beneficial use of the property. (See, e.g., *Lucas* v. *South Carolina Coastal Council, supra*, 505 U.S. at p. __ [120 L.Ed.2d at pp. 808-809, 112 S.Ct. at p. 2890].)

Second, the mere fact that a particular property owner has not been able to make a profit from a particular recreational facility fails to establish that no community recreational facility could be operated profitably on the property. (See, e.g., *Penn Central Transp. Co.* v. *New York City, supra*, 438 U.S. at pp. 120-122 [57 L.Ed.2d at pp. 645-647].) Property is generally deprived of all economically beneficial use where construction is banned entirely, such as when the property is required to remain as open space. Evidence in the record indicates a community recreational facility could be operated profit- ably on the property under certain circumstances.

Finally, the land-use regulations in question restricted the property's use at the time the developer purchased the property. (See, e.g., *Gilbert* v. *State of California* (1990) 218 Cal.App.3d 234, 256 [266 Cal.Rptr. 891].) The land-use regulations had been placed on the property at the request of the developer's predecessor in interest. The developer purchased the property with knowledge of the restrictions and with the intent to develop the property as a private tennis club. Under these facts, the land-use regulations

could not constitute a taking even if the property could not be operated profitably as a community recreational facility. The land-use restrictions on the property coincided with the developer's reasonable investment-backed expectations. He was not constitutionally entitled to develop the property to its most profitable use.

Accordingly, we conclude the first prong of the *Nollan* test has been met. The City was not required to approve the development project and a denial of the request would not have effected a compensable taking. We next look to the second prong of the *Nollan* test.

■ Conditions on approval of a project which serve the same legitimate governmental purpose as a refusal to approve the project do not constitute a taking if the refusal would not have constituted a taking. (*Nollan* v. *California Coastal Comm'n, supra*, 483 U.S. at p. 836 [97 L.Ed.2d at pp. 688-689].) Where the condition on approval constitutes a physical taking of private property, the condition must substantially advance the governmental purpose and is subject to heightened scrutiny by the courts. (*Blue Jeans Equities West* v. *City and County of San Francisco* (1992) 3 Cal.App.4th 164, 169-171 [4 Cal.Rptr.2d 114].) Monetary exactions compelled as a condition of approval must be only rationally related to the governmental purpose. (*Id.* at p. 168 [San Francisco's Transit Impact Development Fee]; *Commercial Builders* v. *Sacramento* (9th Cir. 1991) 941 F.2d 872, 875 [low-income housing fee].)

■ The $280,000 fee was imposed for the express purpose of mitigating the effect of the loss of land restricted to community recreational use which would result from approval of the developer's project. The imposition of the mitigation fee was directly related to the original denial of the developer's applications for his project and was not a subterfuge or pretext to increase the general funds of the City. (Cf. *Morse* v. *San Luis Obispo County* (1967) 247 Cal.App.2d 600, 603 [55 Cal.Rptr. 710].) Moreover, the use of the funds by the City was expressly limited to the provision of recreational facilities for the community. The governmental purpose supporting a denial of the project was the loss of community recreational facilities which would be occasioned by the luxury townhome development. The $280,000 mitigation fee was rationally related to this governmental purpose. Even were we to find the "substantially advance/heightened scrutiny" test of *Nollan* to be applicable, we would conclude that the mitigation fee met this test. There was a substantial nexus between the land-use restriction and the condition of approval.

It is important to note that the mitigation fee was not imposed as a condition relating to the development project's burden on the community for

increased community services, such as community recreational facilities. (See, e.g., *Rohn* v. *City of Visalia* (1989) 214 Cal.App.3d 1463 [263 Cal.Rptr. 319].) The mitigation fee was imposed to compensate the City for the benefit conferred on the developer by the City's approval of the townhome project and for the burden on the community resulting from the loss of recreational facilities.

The developer argues that the mitigation fee did not substantially advance the governmental purpose of providing *private* community recreational facilities, because the fee was to be used to provide *public* community recreational facilities. We do not find the distinction between public and private recreational facilities to be compelling. The property was restricted to community recreational facilities. Approval of the project deprived the community of the opportunity for these recreational facilities. The $280,000 mitigation fee would in some measure allow the City to replace the lost recreational facilities. Whether the facilities were provided to the public in the form of a privately owned facility or one which was owned by the public is not significant on the issue of whether the governmental purpose is the same. The City had a legitimate need for community recreational facilities whether public or private, and both the land-use restriction and the mitigation fee served that same need.

The developer also argues that the City was not deprived of community recreational facilities by its approval of the development project, because he had already abandoned the recreational facility and was no longer in business. This argument does not withstand close scrutiny. Of course, the City could not require that the developer operate a recreational business on the property. (*Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 908-911 [223 Cal.Rptr. 379] [restrictions on condominium conversions].) Developer was entitled to go out of business and leave his land vacant or sell it to someone else. The City could, however, require that the developer use his property, if at all, for a recreational purpose. This restriction is no different than refusing to permit apartments to be converted to condominiums. (*Ibid.*)

Finally, the developer argues the amount of the fee is arbitrary and excessive. The City, however, presented evidence that the value of the recreational facilities, which existed on the property prior to their removal, was $800,000. The City also presented evidence that the townhome project was valued at $10 million. In addition, the fee was related to the cost of constructing four tennis courts at another location ($275,000 to $300,000). The trial court did not find that the amount was excessive. Under these circumstances, we cannot say the fee was excessive or arbitrary.

B. *Special Tax*

■ The City contends the trial court erred in finding that the $280,000 mitigation fee constitutes a prohibited special tax. The developer responds that the $280,000 mitigation fee constituted a special tax "in the sense that the exaction constitutes an unequal tax discriminatorily applied." Pursuant to Proposition 13, a city may impose a special tax only by a two-thirds vote of the electorate. (Cal. Const., art. XIII A, § 4.) A special tax (Gov. Code, § 50075) does not include a fee which "does not exceed the reasonable cost of providing the service or the regulatory activity for which the fee is charged and which is not levied for general revenue purposes." (Gov. Code, § 50076.)

"Much has been written on the subject whether development fees are special taxes. [Citations.] Under one line of reasoning, development fees are not taxes at all since they do not bear the indicia characteristic of taxes: they are not compulsory but rather apply only to those who voluntarily choose to develop, they are not imposed upon all nonexempt properties alike, and they are not levied for the purpose of producing general revenue. [Citations.] These cases hold that development fees are in the nature of special assessments rather than taxes. Consequently, the limitations described by Article XIII A, section 4 [of the California Constitution], do not apply. [Citations.] Indeed, it stands to reason that voters could be expected to endorse the imposition of 'taxes' which only the developers would be obliged to pay. Thus, where the fees at issue are directed only at a partial segment of the population, the voting process will not necessarily validate them as 'special taxes.' [Citation.] On the other hand there are cases holding that a development fee may be an invalid special tax absent a two-thirds vote if it exceeds the reasonable cost of providing the service for which it is charged. [Citations.]" (*Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218, 240 [1 Cal.Rptr.2d 818].)

■ "Typically, a development fee is an exaction imposed as a precondition for the privilege of developing land, commonly enacted in order to lessen the adverse impact of increased population generated by the development. [Citation.] On the other hand, special taxes as defined in Proposition 13 (Cal. Const., art. XIII A, § 4) are 'taxes . . . levied for a specific purpose rather than . . . a levy placed in the general fund to be utilized for general governmental purposes.' [Citation.] [¶] 'One characteristic of a special tax is that it levies a fee to replace revenue for services which were affected by the reduction caused by article XIII A. [Citations.] In contrast, the [development fee] is not intended to replace revenues lost as a result of article XIII A. It is triggered by the voluntary decision of the developer to construct [the project]

and is directly tied to the increase in [burdens] that this construction will possibly generate.' " (*Carlsbad Mun. Water Dist.* v. *QLC Corp.* (1992) 2 Cal.App.4th 479, 485-486 [3 Cal.Rptr.2d 318].) "The determination of whether a particular fee is a development fee or a special tax is a question of law." (*Id.* at p. 485.)

We doubt the $280,000 mitigation fee at issue here can properly be characterized as a special tax. As noted in *Shapell Industries, Inc.* v. *Governing Board, supra,* 1 Cal.App.4th at page 240, even a typical development fee does not easily come within the confines of the definition of a special tax. The typical development fee is not compulsory; it is applicable only to those who voluntarily choose to develop their properties; it is not applicable to all property; and it is not designed to generate general revenue. The $280,000 mitigation fee is even less like a special tax than the typical development fee. A typical development fee is applicable to all who choose to develop properties. The $280,000 mitigation fee in this case has been imposed on a single developer and is a one-time nonrecurring exaction for the approval of a development. The $280,000 mitigation fee is not a special tax.

Even were we to conclude that the mitigation fee was subject to the requirements of Government Code section 50076, we would, nevertheless, conclude the mitigation fee did not constitute a special tax. As noted previously, the amount of the fee is reasonably related to the actual costs of mitigating the loss of community recreational facilities, i.e., $280,000 represents the actual cost of replacing just four tennis courts. Accordingly, the amount of the fee does not exceed the reasonable cost of providing the service for which the fee was imposed. Once again, it is important to focus on the fact that the $280,000 fee was not imposed on the developer to mitigate the increase in requests for recreational facilities resulting from his 30 townhomes. It was imposed to compensate the community for the loss of recreational facilities in the community occasioned by the change in the land-use restrictions. (Compare *Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208 [265 Cal.Rptr. 347].)

The mitigation fee also was not levied for general revenue purposes. (*Terminal Plaza Corp.* v. *City and County of San Francisco, supra,* 177 Cal.App.3d at pp. 906-907.) The developer argues the record establishes that the City had a preexisting need for funds for public recreational facilities, and the mitigation fee was imposed to alleviate this problem. This is not an accurate representation of the record. The mitigation fee was imposed for the sole purpose of replacing recreational facilities lost to the community as a result of the land-use changes requested by the developer; expenditure of the fee was expressly limited for this purpose. (See, e.g., *California Bldg.*

*Industry Assn.* v. *Governing Bd.* (1988) 206 Cal.App.3d 212, 236 [253 Cal.Rptr. 497].) The fee was not intended to replace revenue lost as a result of Proposition 13; it was triggered by the developer's voluntary decision to develop his recreational facility into a luxury townhome project; it is directly tied to the replacement of lost recreational facilities. (See, e.g., *Carlsbad Mun. Water Dist.* v. *QLC Corp.*, *supra*, 2 Cal.App.4th at p. 491.) The fact that no specific plans for expenditure of the funds were adopted does not require a different result. (*Garrick Development Co.* v. *Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 331 [4 Cal.Rptr.2d 897].)

### C. *Equal Protection*

■ The developer argues the $280,000 mitigation fee violates his equal protection rights. Our conclusion that the mitigation fee bears a reasonable relationship to the loss of recreational facilities occasioned by the land-use changes disposes of this claim. (*Shapell Industries, Inc.* v. *Governing Board*, *supra*, 1 Cal.App.4th at pp. 247-248; cf. *Garrick Development Co.* v. *Hayward Unified School Dist.*, *supra*, 3 Cal.App.4th at p. 338.)

### D. *Government Code Section 66000 et seq.*

■ Although the trial court did not reach this issue, the developer contends the mitigation fee is also invalid as a result of the City's failure to comply with Government Code section 66001. We are not persuaded by this argument. Effective January 1, 1989, the Legislature established a procedural scheme for the imposition of fees for development projects by local agencies. (Gov. Code, § 66000 et seq.) Under the statutory scheme, a development project is a "project undertaken for the purpose of development [and] includes a project involving the issuance of a permit for construction. . . ." (*Id.* at § 66000, subd. (a).) A fee is a monetary exaction which is charged by a local agency in connection with the approval of a development project for the purpose of defraying the cost of public facilities related to the development project. (*Id.* at § 66000, subd. (b).) A charter city is a local agency. (*Id.* at § 66000, subd. (c).)

When a local agency imposes fees on development projects pursuant to an initial, quasi-legislative adoption of development fees, the local agency must: (1) identify the purpose of the fee; (2) identify the use to which the fee is to be put; (3) determine how there is a reasonable relationship between the fee's use and the type of development project; and (4) determine how there is a reasonable relationship between the need for the public facility and the type of development project. (Gov. Code, § 66001, subd. (a).) When a local agency imposes a development fee on a case-by-case adjudicatory basis, the

local agency must determine how there is a reasonable relationship between the amount of the fee and the cost of the public facility attributable to the development project. (*Id.* at § 66001, subd. (b);[2] *Garrick Development Co.* v. *Hayward Unified School Dist.*, *supra*, 3 Cal.App.4th at pp. 334-337.)

"These requirements appear to expand slightly on the reasonable relationship test previously used by courts to test quasi-legislative action like the [City's] in this case. Having the use and purpose of the fee identified, the agency has to find a 'reasonable relationship' between the 'type' of project

---

[2]Government Code section 66001 reads as follows:

"(a)   In any action establishing, increasing, or imposing a fee as a condition of approval of a development project by a local agency on or after January 1, 1989, the local agency shall do all of the following:

"(1)   Identify the purpose of the fee.

"(2)   Identify the use to which the fee is to be put. If the use is financing public facilities, the facilities shall be identified. That identification may, but need not, be made by reference to a capital improvement plan as specified in Section 65403 or 66002, may be made in applicable general or specific plan requirements, or may be made in other public documents that identify the public facilities for which the fee is charged.

"(3)   Determine how there is a reasonable relationship between the fee's use and the type of development project on which the fee is imposed.

"(4)   Determine how there is a reasonable relationship between the need for the public facility and the type of development project on which the fee is imposed.

"(b)   In any action imposing a fee as a condition of approval of a development project by a local agency on or after January 1, 1989, the local agency shall determine how there is a reasonable relationship between the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed.

"(c)   Upon receipt of a fee subject to this section, the local agency shall deposit, invest, account for, and expend the fees pursuant to Section 66006.

"(d)   The local agency shall make findings once each fiscal year with respect to any portion of the fee remaining unexpended or uncommitted in its account five or more years after deposit of the fee to identify the purpose to which the fee is to be put and to demonstrate a reasonable relationship between the fee and the purpose for which it was charged. The findings required by this subdivision need only be made for moneys in the possession of the local agency and need not be made with respect to letters of credit, bonds, or other instruments taken to secure payment of the fee at a future date.

"(e)   Except as provided in subdivision (f), the local agency shall refund to the then current record owner or owners of lots or units of the development project or projects on a prorated basis the unexpended or uncommitted portion of the fee, and any interest accrued thereon, for which need cannot be demonstrated pursuant to subdivision (d). A local agency may refund the unexpended or uncommitted revenues by direct payment, by providing a temporary suspension of fees, or by any other means consistent with the intent of this section. The determination by the governing body of the local agency of the means by which those revenues are to be refunded is a legislative act.

"(f)   If the administrative costs of refunding unexpended or uncommitted revenues pursuant to subdivision (e) exceed the amount to be refunded, the local agency, after a public hearing, notice of which has been published pursuant to Section 6061 and posted in three prominent places within the area of the development project, may determine that the revenues shall be allocated for some other purpose for which fees are collected subject to this chapter and which serves the project on which the fee was originally imposed."

and both the fee's use and the need for the facility. In our case, the type of project . . . had to bear a reasonable relationship to the need for the facility and the use to which the fee would be put." (*Garrick Development Co.* v. *Hayward Unified School Dist.*, *supra*, 3 Cal.App.4th at p. 334.)

Here, the City found that the mitigation fee would be used to pay for replacement of community recreational facilities which had been provided for by the land-use restrictions on the property, the opportunity for which recreational facilities would be lost by approval of the project. The City found that the recreational facilities which had been on the property included tennis courts, paddle tennis courts, swimming pool, running track, aerobics area, jacuzzi, and sauna. The City found that the value of the recreational facilities which had been on the property was $800,000, the value of the project was $10 million, and the replacement cost of just four tennis courts would be approximately $280,000. The $280,000 was earmarked specifically to replace community recreational facilities. These findings are adequate and reasonable.[3] As we have already concluded, the mitigation fee and its amount had a substantial nexus to the loss of recreational facilities occasioned by the approval of the development project. There is no statutory requirement that the City specifically designate the precise nature and location of the recreational facilities to be built. Adequate safeguards for the appropriate use of the mitigation fee are contained in Government Code sections 66001 [fee as condition of approval; agency requirements], 66002 [capital improvement plan; adoption; updates; hearings] and 66006 [local agency improvement fees; public availability of account or fund information].

## II.   *In Lieu Art Fee*

In 1988, the City adopted an ordinance to establish an Art in Public Places Program. The ordinance set forth the purpose of the program: "(a) Cultural and artistic resources enhance the quality of life for individuals living in, working in and visiting the City. [¶] (b) Balanced development of cultural and artistic resources preserves and improves the quality of the urban environment and increases real property values. [¶] (c) As development and revitalization of the real property within the City continues, the opportunity for creation of cultural and artistic resources is diminished. [¶] (d) As this development and revitalization continues as a result of market forces, urbanization of the community results. [¶] (e) As these opportunities are diminished and this urbanization occurs, the need to develop alternative sources

---

[3]These findings are contained in the ordinance and the minutes of the city council meeting at which the ordinance was adopted.

for cultural and artistic outlets to improve the environment, image and character of the community is increased. [¶] (f) Development of cultural and artistic assets should be financed by those whose development and revitalization diminishes the availability of the community's resources for those opportunities and contributes to community urbanization. [¶] (g) Establishment of this Art in Public Places Program will promote the general welfare through balancing the community's physical growth and revitalization and its cultural and artistic resources."

The ordinance provided that certain development projects with a building valuation in excess of $500,000 and remodeling projects with a valuation in excess of $250,000 were required to participate in the Art in Public Places Program as a condition to approval of the project. Participation could take one of four forms at the option of the developer: (1) Art work could be placed on the project. The developer would select the art work subject to the City's approval, and the developer would be the owner of the art work. (2) The developer could choose to pay a fee in lieu of placing art work on the property. The in lieu art fee would be placed in a City art fund and used to purchase art work for display in the City. (3) The developer could post a bond in the amount of the fee. (4) The developer could donate art work to the City subject to the City's approval. In the latter three instances, the art work would belong to the City. The cost of the art work or the in lieu art fee was to be equal to one percent of the building valuation.

The building valuation was calculated pursuant to a formula, which in the case of this development project equalled $3,322,000. Accordingly, the art cost or in lieu art fee was determined to be $33,220. Apparently, the developer elected to pay the in lieu art fee rather than place art work on his project.

As noted previously, the trial court refused to invalidate the in lieu art fee. The trial court found: "The City's police powers extend to imposing certain requirements on construction projects. For example, so long as not to the extent of a taking, the City may specify pursuant to its police powers setbacks, amount of open space to be retained, landscaping requirements, etc. Here the City has imposed a requirement of art placement or, in lieu of art placement, a fee for art at a different location. [The developer] has opted for the fee payment. This seems quite analogous to an in-lieu parkland fee. [¶] If the City can require landscaping or the planting of a tree on-site, could the City not allow instead as an option the funding of the planting of a tree or landscaping off-site? It seems that for [the developer] to invalidate the in-lieu art fee, [the developer] would have to establish that the City has no

power to require art on the site. If it can require art on the site, then by analogy to the parkland fee, the City can instead allow payment of a fee for art off the site. [¶] The court finds the art fee within the scope of the City's police powers . . . . [The developer] may set a further hearing, if [he] so desires, regarding the question of the City's compliance with the proper procedure in specifying the use to which [the developer's] fee shall be put and the steps taken to ensure that proper use."

■ The developer contends the in lieu art fee must be invalidated for the following reasons: the City did not comply with Government Code section 66000 et seq.; the in lieu art fee is an illegal permit condition; the in lieu art fee is an unconstitutional special tax; and the in lieu art fee violates his first amendment right to free speech.

The Art in Public Places Program of the City is unlike typical permit conditions in many respects. On the one hand, it is very similar to landscaping, parking, and lighting conditions, which require a developer to include certain design elements in a project. There can be no question that such permit conditions are legitimate exercises of a local agency's police powers, provided the conditions are reasonable. Ordinarily, however, these conditions cannot be met by off-site improvements or in lieu fees.

On the other hand, the in lieu art fee provision is similar to a parkland dedication requirement by which a developer must either dedicate to the local agency land for parks or pay a fee in lieu of that dedication. There is also no question that such parkland dedication requirements are valid permit conditions. (*Associated Home Builders, etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847].) The in lieu art fee is, however, unlike an in lieu parkland fee in one very important respect. As to parklands, the developer has two options, both of which require the developer to give something to the local agency, either land or a fee. In the case of the in lieu art fee, the developer has several options. Under one option, the developer may place art valued at a certain amount on the project and the developer continues as the owner of the art. Under this option, the developer gives nothing to the City. Only if the developer chooses, may the developer donate art to the City, pay a fee in lieu, or post a bond in lieu. Under these options, the developer pays a fee to the City.

We agree with the trial court that it is within the City's police powers to require art to be placed on developments as a condition of approval. (Cf. *Agins* v. *City of Tiburon* (1980) 447 U.S. 255 [60 L.Ed.2d 106, 100 S.Ct.

2138] [scenic zoning]; *Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. 104 [landmark preservation]; *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016] [residential zoning]; Gov. Code, § 15813 et seq. [art in public buildings].) Such a requirement does not constitute an exaction, a development fee, a taking, or a tax. We further agree with the trial court that the mere giving of an option to the developer to pay a fee in lieu of the placement of art on the project does not convert the lawful permit condition into a fee, an exaction, a tax, or a taking. Here, the developer chose to pay a fee rather than place on the project art which the developer would continue to own and which would presumably add value to the project. The developer cannot now complain of his voluntary choice to pay a fee. We conclude that the fee paid by the developer in this case is not a development fee as set forth in Government Code section 66000 et seq., is not a taking of private property under *Lucas* and *Nollan*, and is not a special tax prohibited by California Constitution, article XIII A.[4]

■ We also do not find any violation of the developer's First Amendment right to freedom of speech. The developer contends his First Amendment rights have been violated because he is required to pay a fee to the City for art which may express an opinion which the developer may find objectionable. As we have already noted, the developer is not required to pay a fee to the City for art. The developer could have placed art of his choosing in his project, subject only to the reasonable approval of the City. The developer could also have purchased art and donated it to the City for placement elsewhere, subject to the City's reasonable right of approval. The developer does not argue that such rights of approval violate his First Amendment rights. If the developer elects to pay a fee instead of choosing the art, the developer may not then complain that his First Amendment right to freedom of speech has been violated.

■ Finally, we conclude the in lieu art fee did not violate the developer's right to equal protection. The developer maintains that the lack of art and cultural facilities in the City is a community-wide problem, which should not be borne solely by developers of large-scale construction projects. We disagree. There is legitimate public interest in the expansion of available art and artistic creations. (Gov. Code, § 15813.) The City's Art in

---

[4]If we were to decide these issues under the developer's analytical framework, we would conclude that the requirements of Government Code section 66000 et seq. were substantially complied with, the fee does not constitute a taking because it did not provide for a physical intrusion of the property and did not render the property valueless, and the fee is a voluntary non-general-revenue-generating development fee which did not constitute a special tax.

Public Places Program is reasonably related to the promotion of this public interest. The required cost of the art to be placed in a project is reasonably related to the value of the project. (Cf. Gov. Code, § 15813 ["The Legislature recognizes that other states have enacted legislation requiring the expenditure of 1 percent of funds allocated for the construction of state buildings for works of art for such buildings."].) Frequently, landscaping of a project costs between 10 and 20 percent of the project's cost. Courts have historically upheld requirements by local agencies for various on-site improvements such as landscaping, lighting, parking, storm drains, curbs and gutters, scenic views, and open space. (E.g., *Agins* v. *City of Tiburon, supra,* 447 U.S. 255; *City and County of San Francisco* v. *Golden Gate Heights Investments* (1993) 14 Cal.App.4th 1203 [18 Cal.Rptr.2d 467].) Artwork warrants no different treatment. The requirement of the placement of art work on large-scale construction projects is reasonably related to a legitimate public purpose and rationally related to the construction itself. It is not for the judiciary to determine the wisdom of such a requirement. (*Garrick Development Co.* v. *Hayward Unified School Dist., supra,* 3 Cal.App.4th at p. 333.)[5]

## III.  *Reinstatement of the Lien*

As noted previously, in the January 8, 1990, agreement, the developer and the City agreed that the City would obtain a lien against the property as security for payment of the $280,000 mitigation fee. The City recorded such a lien on January 9, 1990. In its judgment partially granting the petition for writ of mandate dated November 8, 1990, the trial court ordered the City to set aside the $280,000 mitigation fee and remove the lien against the property. The trial court retained continuing jurisdiction over the case.

On November 15, 1990, the trial court issued a peremptory writ of mandate directing the City to take all necessary action to remove the lien and to file a return by December 17, 1990, detailing the actions taken to comply with the writ. The trial court filed a revised judgment on December 14, 1990, extending the time for removal of the lien by the City to January 7, 1991, in order to allow the City to obtain extraordinary appellate review. The trial court issued a revised peremptory writ of mandate ordering the City to take all necessary action to remove the lien by January 7, 1991. The City was also ordered to file a return to the writ by January 28, 1991.

---

[5]Since we have concluded that both the $280,000 mitigation fee and the in lieu art fee are valid conditions of the approval of the developer's project, we need not discuss whether the developer is entitled to attorney fees.

On January 4, 1991, the City filed a notice of appeal from the December 14, 1990, revised judgment. On January 7, 1991, the City deposited with the trial court an executed but unrecorded release of the lien to be held by the trial court pending a decision on the City's appeal by this court. On January 15, 1991, the trial court ordered the court clerk to record the release of the lien. On January 17, 1991, the City filed a notice of appeal from the January 15, 1991, order of the trial court directing recordation of the release of lien. On January 25, 1991, the developer filed a notice of cross-appeal from the December 14, 1990, revised judgment. On February 11, 1991, the trial court awarded the developer sanctions against the City in the amount of $5,804.75 for the City's bad faith tactics in connection with the release of the lien. The City did not appeal from this order. On March 20, 1991, the trial court revised the judgment to award the developer his costs and attorney fees in the amount of $75,000. The City was given credit against this award for the amount of the sanctions previously awarded. On May 10, 1991, the City filed a notice of appeal from the revised judgment of March 20, 1991.

The City argues the trial court acted without jurisdiction when it ordered the recordation of the release of lien after the City filed a notice of appeal. We need not address this issue. That issue is moot. The lien has been released and has had no force and effect in the interim as to third parties. As a result of our decision finding that the $280,000 mitigation fee is valid, the City may reinstate the lien, however, only to the extent of any interest the developer has in the property at the time of the reinstatement. If the developer no longer has an interest in the property, the City is left to the normal procedures for the collection of judgments.

## DISPOSITION

The judgment is reversed to the extent the trial court ordered the City to vacate the $280,000 mitigation fee and awarded the developer attorney fees. The judgment is affirmed to the extent the trial court denied the petition for writ of mandate as to the in lieu art fee. The trial court is ordered to vacate its judgment (as revised) and to vacate the peremptory writ and enter a new and different judgment denying in full the petition for writ of mandate. There has been no appeal from the sanctions order and that order is unaffected by this appeal. The matter is remanded to the trial court to determine whether, and to what extent, a lien on the property should be reinstated and

for other further proceedings consistent with this opinion. The City is awarded its costs on appeal.

Boren, J.,* and Jackson, J.,† concurred.

A petition for a rehearing was denied June 23, 1993, and the petition of appellant Richard K. Ehrlich for review by the Supreme Court was denied August 26, 1993. Panelli, J., was of the opinion that the petition should be granted.

---

*Presiding Justice of the Court of Appeal, Second District, Division Two, sitting under assignment by the Chairperson of the Judicial Council.

†Judge of the Municipal Court for the Antelope Judicial District, sitting under assignment by the Chairperson of the Judicial Council.